In the Matter of IRA HAUPT & CO., a Limited Partnership, Bankrupt.
No. 64–B–259.

United States District Court
S. D. New York.
March 10, 1965.

---

See also, 343 F.2d 726.

**12**

Samuel P. Adelman, New York City, for petitioner One Estate, Inc.

Milbank, Tweed, Hadley & McCloy, New York City, for petitioners The Chase Manhattan Bank and the New York Stock Exchange.

Rosenman, Colin, Kaye, Petschek & Freund, New York City, for petitioners Bernard Klebanow, and others.

Simpson, Thacher & Bartlett, New York City, for petitioner Manufacturers Hanover Trust Co.

Irving Younger, New York City, for petitioners Julian J. Bauman, and others.

Zalkin & Cohen, New York City, for petitioners First National City Bank and Morgan Guaranty Trust Co.

THOMAS F. MURPHY, District Judge.

We have for resolution petitions for review of "orders" of Referee Edward J. Ryan. The petitioners are: Klebanow, et al., limited partners of the bankrupt (Limited Partners); the New York Stock Exchange and several banks (Exchange and Banks) and One Estate, Inc., a landlord of the bankrupt (Landlord). The principal questions presented are (a) were the Limited Partners properly disqualified from voting in the election for a trustee; (b) were the Exchange and Banks likewise properly disqualified; (c) did the referee err under the circumstances hereinafter discussed in disallowing the claim by the Landlord for voting purposes; (d) did the referee err under the circumstances hereinafter discussed in allowing votes to be cast by nine former employees of the bankrupt (Employees); and (e) under all of the circumstances, did the referee err in approving the appointment of Charles Seligson as trustee on October 6, 1964.

PRELIMINARY FACTS

On November 20, 1963, Ira Haupt & Co., a limited partnership in the stock brokerage business, having 16 general and 13 limited partners, was suspended by the Exchange. At that time Haupt was insolvent (a condition that arose out of the so-called salad oil scandal of November, 1963). On November 25, 1963, the general partners of Haupt signed an agreement with the Exchange and Banks whereby the Exchange would advance a fund to pay Haupt's customer creditors and the Banks would defer their claims against Haupt to the extent of $2 for every $1 advanced by the Exchange. The agreement provided for the appointment

of a committee (the Committee) to effect the orderly liquidation of Haupt on which the Exchange and Banks were to be equally represented. James P. Mahony, Chief Examiner of the Exchange was named Liquidator. Morton Kamerman, a general partner and sole managing partner of Haupt, was engaged by Mahony to assist in the liquidation. On March 10, 1964, a supplemental agreement was made under which, *inter alia*, Edward Feldman succeeded Mahony since all but 150–200 of the customer accounts were satisfactorily liquidated and Mahony's expertise was no longer required.

On March 23, 1964, an involuntary petition in bankruptcy was filed against Haupt by the Limited Partners. On March 30, 1964, a petition under Chapter XI was filed on behalf of Haupt ostensibly by the general partners which provided for an arrangement which would in effect continue the operation under the original agreement of November 25, 1963. The lists were beginning to be marked off and so the jousting began.

Haupt moved on March 31, 1964, for an order staying an adjudication and on April 8th for an order staying and enjoining the Limited Partners from continuing with certain actions pending in this court and in the Supreme Court of the State of New York. The Limited Partners moved on April 9th for an order dismissing the Chapter XI petition. Haupt countered on April 21st by moving for an order dismissing the application to dismiss the Chapter XI proceeding. All of the motions were adjourned to April 27, 1964, the date which had been set for the first meeting of creditors in the Chapter XI proceeding. At this meeting the creditors were afforded an opportunity to nominate a trustee in case it should become necessary to administer the estate in bankruptcy.

On April 27, 1964, Edward Feldman and Abraham Glickman were nominated and claims were voted for them. The referee deferred ruling on the outcome of the election until the parties had had an opportunity to present evidence and memoranda on the claims sought to be voted, the qualification of the candidates, etc.

The referee rendered his decision on June 10th and entered an order on June 26th dismissing the Chapter XI proceeding on the grounds that (1) all the partners had not joined in the petition, which was not voluntary in any event since it was the act of the Committee set up by the November 25th agreement and not the act of the general partners who had, in effect, surrendered the firm's power to make independent judgments to the Exchange and Banks, acting through their agent, the Liquidator, and (2) that a Chapter XI proceeding was not appropriate to accomplish the liquidation of Haupt. The referee also held Edward Feldman elected as trustee, reserving decision on Mr. Feldman's qualifications. In so doing, he held that the Limited Partners, who had voted five claims totaling $1,795,861 for Mr. Glickman, were prevented from voting by § 44, sub. a of the Bankruptcy Act, 11 U.S.C. § 72, sub. a. This left only the ten claims totaling $11,417,174 voted for Feldman by several of the banks and others. The Limited Partners had attacked the right of all these claimants to vote, save one, Oliver Lundquist representing $19,000. The referee held it unnecessary to rule upon the objections since the one claim of Lundquist was sufficient to elect Mr. Feldman. Apparently on the day he entered the order on his decision of June 10th he then disqualified Feldman on the ground that he was too closely connected with the debtor.[1]

---

1. On July 16, 1964, a first meeting of creditors in the bankruptcy proceeding was held. At that time it became clear that the referee felt he had disqualified Mr. Feldman as of June 26th, at which time he had orally suggested he would not approve the appointment and had an-nounced that at the meeting of July 16th creditors would be given an opportunity to elect a trustee (p. 10–11 of the transcript of the meeting of July 16, 1964; all such references are to the transcript). There was some discussion as to the propriety of the manner in which this ruling

On August 11, 1964, Judge Palmieri, on petition for review, affirmed the referee's dismissal of the Chapter XI petition and the disqualification of the Limited Partners from voting.[2]

## THE ELECTION AND APPROVAL OF THE TRUSTEE

At the adjourned first meeting of creditors on September 11, 1964,[3] the referee called for nominations for trustee. He stated his intention to proceed in the following order: (1) nominations; (2) voting; (3) objections to the claims voted, i. e., capacity of the voters, the quality of the claims, solicitation and other impediments and (4) consideration of the competency and capacity of the trustee elected by the creditors.

Nominations were made and votes cast as follows: (1) Charles Seligson, nominated by one of the banks, received the votes of 30 creditors (Banks, Exchange, brokerage houses and nine Employees of the bankrupt) representing $19,118,549.06; (2) Samuel Adelman, nominated by Lundquist, the creditor responsible for the previous election of the thereafter disqualified Edward Feldman, received the votes of four creditors including the Landlord representing $636,557.99; (3) Abraham Glickman, nominated by counsel for the Limited Partners, received the votes of seven such creditors representing $2,787,660.31.

The referee, announcing his intention to adhere to his prior ruling, held that the Limited Partners were disenfranchised under § 44, sub. a of the Bankruptcy Act, leaving nominee Glickman with no votes. The referee also disenfranchised the Exchange and the Banks, holding that under § 44(a) they constituted "other controlling bodies" of the bankrupt.[4] After the disenfranchisement of the Limited Partners and the Exchange and Banks, there were four claims for Adelman representing $636,557.99, and 23 for Seligson representing $383,362.66, with objections lodged against almost all these claims. Then followed a hearing on the objections to the Landlord's claim, which represented the bulk of the amount which had been voted for Mr. Adelman, and considerable discussion as to the merits of the claims of the nine former Employees, which had been voted for Mr. Seligson, with the latter group being finally allowed.

Eventually, the time came when all had been heard on the capacity of voters and the quality of the claims voted, leaving the question of solicitation and other impediments and the question of the capacity of the trustee still open. Relying on the Pan-American Match Co.[5] case, the referee elected not to further delay the election to go into the objections but to provisionally disallow all the Seligson claims against which objections had been

was accomplished and its effect on the time to petition for review. The July 16th meeting was adjourned to September 11th to avoid the possibility of further contested elections should Judge Palmieri overrule the referee's decisions, with Mr. Feldman to continue managing Haupt in the interim.

2. In re Ira Haupt & Co., 234 F.Supp. 167 (S.D.N.Y.1964). Argument on appeal was heard on January 20, 1965.

3. See note 1, supra.

4. Mr. Freund, counsel for the Limited Partners also objected to these seven claims on the grounds that the claimants were defendants in suits brought on behalf of Haupt, and that the Banks had received preferences. The claim of the Exchange was also contested on the

ground that by providing the fund it had participated in the preferences awarded the Banks; and this objection was sought to be applied also to the brokerage firms, members of the Exchange, since it was alleged their interest was inseparable from that of the Exchange, an unincorporated association. This objection to the brokerage firms was overruled. (86). Further objections were made against all claims voted for Seligson by the brokerage houses on the ground that they were unliquidated in amount, and the same objection, as well as, in some cases, that of alleged preferences, was lodged against the other creditors who voted for Seligson.

5. In re Pan-American Match Co., 242 F. 995 (D.Mass.1917).

lodged except the claims of the Employees, and declared that "Seligson has been elected trustee on 9 claims in the amount of $153,944.25; the other count being 3 claims for Samuel Adelman in the sum of $34,006.77." [6] The referee declined to reopen the election except insofar as solicitation was concerned, which was to be taken up at the next meeting. The meeting was then adjourned to September 30, 1964.

The September 30th meeting was devoted to the expounding of objections by the Landlord to the disallowance of its claim and resulting confusion as to whether the referee had allowed $95,-615.45 of such claim plus an application by the Limited Partners to reopen the voting to prove that the nine claims of the Employees were tainted with fraud, before the referee could proceed on his announced procedure, viz., the resolution of the issues relating to solicitation. An associate in the law firm representing the Exchange was examined on the matter of solicitation by the Exchange and the Banks of the Employees' claims, raised and pursued by Mr. Adelman who was also counsel for the Landlord. The referee then allowed examination of Mr. Kammerman by Mr. Freund, counsel for the Limited Partners, on the question of whether the filing of these claims amounted to fraud since it was alleged no money was in any way due the Employees and they knew it. Cross-examination by Mr. Younger, counsel for the Employees, had scarcely commenced when the meeting was abruptly terminated and adjourned by the referee to October 23rd.

On October 5th the referee caused all parties concerned to be telephoned and told to appear on October 6th. On October 6th the referee advised that he had deferred the approval of Seligson pending the outcome of the hearings adjourned to October 23rd, but since that time he had been informed by Mr. Feldman that Haupt's rights against certain insurance carriers would be in jeopardy if not pursued promptly and announced that the question was "why I should not approve the appointment of Charles Seligson at this time subject to his removal in the event the issues that are raised on the two motions of Mr. Adelman and Mr. Freund should be resolved in such a manner as would require that removal." Mr. Feldman was called and testified that certain insurance carriers had already extended the time within which the proofs of claim were to be filed but in so doing had reserved their rights to claim as a defense any prejudice resulting from the delay. Ultimately the referee stated "I intend to and will approve the appointment of Charles Seligson" and he entered the order approving the appointment.

Subsequent hearings will be described hereinafter insofar as they relate to a particular subject.

## THE DISENFRANCHISEMENT OF THE LIMITED PARTNERS

Section 44, sub. a of the Bankruptcy Act, 11 U.S.C. § 72, sub. a provides:

"The creditors of a bankrupt, exclusive of the bankrupt's relatives or, where the bankrupt is a corporation, exclusive of its stockholders or members, its officers, and the members of its board of directors or trustees or of other similar controlling bodies, shall * * * appoint a trustee * * * of such estate."

Section 1, sub. 8 of the Act, 11 U.S.C. § 1, sub. 8, defines Corporations as follows:

" 'Corporation' shall include all bodies having any of the powers and privileges of private corporations not possessed by individuals or partnerships and shall include partnership associations organized under laws making the capital subscribed alone responsible for the debts of the association, joint-stock companies, un-

---

6. As was pointed out at the time (161-62), of the three claims apparently allowed for Adelman two had been objected to; leaving one Adelman claim not objected to representing $19,000 (the Lundquist claim).

incorporated companies and associations, and any business conducted by a trustee or trustees wherein beneficial interest or ownership is evidenced by certificate or other written instrument;"

In disenfranchising the Limited Partners the referee announced his intention to adhere to his ruling made in the previous election as set out in the order of June 26, 1964, which held simply that the broad language of the above quoted sections prevented the Limited Partners from voting. In affirming the prior ruling Judge Palmieri held that the 1938 Amendment to § 1, sub. 8 eliminating "limited partnerships" from the definition of corporations did not preclude the application of § 44, sub. a to limited partners. The court felt that Congress had made the change,

> "not because of any preoccupation with the disenfranchising provisions, but because it had amended § 5, 11 U.S.C. § 23, so as to expand the application of this section to limited partnerships, a result completely consonant with the previous structure of the statute. This made it no longer necessary to include such partnerships as part of the corporation definitions. There was not, however, any abridgement of the basic principle that the purpose of the disenfranchising provisions is to prevent the election of a trustee who may be too closely related to the bankrupt and thus impair a vigorous independent defense of the creditors' interests. These provisions merely extend to make mandatory 'a policy which the Courts had sometimes enforced in the absence of express statutory direction.' * * * The Referee's conclusion is therefore sustainable on equitable as well as statutory grounds." In re Ira Haupt & Co., 234 F.Supp. 167, 171 (S.D.N.Y.1964).

The Limited Partners now argue that Judge Palmieri erred in that his decision was based on his mistaken assumption that the disenfranchising provisions were part of § 44, sub. a, prior to the elimination of limited partnerships from the definition of "Corporations." The claim is also made that the court erred in holding that the disenfranchisement could be sustained on equitable grounds, if, indeed, equitable considerations were relevant. In answer to the argument that Judge Palmieri's decision is the law of this case, the Limited Partners contend as follows. The court made an error on a point of law. The doctrine of law of the case "does not rigidly bind a court * * * but is only addressed to its good sense." Higgins v. California Prune & Apricot Grower, Inc., 3 F.2d 896, at 898 (2d Cir. 1924). The "good sense" was explained, say the Limited Partners, in Zdanok v. Glidden Co., Durkee Famous Foods Division, 327 F.2d 944 (2d Cir. 1964) where the Circuit Court stated that "a clear conviction of error on a point of law that is certain to recur * * * will prevail over 'the law of the case' whereas 'mere doubt' will not." Id. at 953. Thus, the argument runs, the doctrine of law of the case is overcome. Further, the doctrine of law of the case should not apply at all since the district court's affirmance of the referee's decision concerned the election in the Chapter XI proceeding, while we are concerned with the subsequent election in bankruptcy.

We feel that the doctrine of law of the case is particularly applicable here. Assuming that the "good sense" referred to by Judge Hand does come down to "a calculus of the relative unseemliness of a court's altering a legal ruling as to the same litigants, with the danger that this may reflect only a change in the membership of the tribunal, and of its applying one rule to one pair of litigants but a different one to another pair identically situated" Ibid., the balance is all in favor of not reviewing the question here. The above quoted language, said the Court of Appeals, would explain "why a clear conviction of error on a point of law that is certain to recur * * * will prevail over 'the law of the case' whereas 'mere doubt' will not. In the former in-

stance the court knows that later litigants will be governed by a different rule; in the latter that is only a possibility." Ibid. The clear error of law in Johnson v. Cadillac Motor Car Co., 261 F. 878, 8 A.L.R. 1023 (2d Cir. 1919), resulted when, between the Circuit Court's first decision, governed by state law, and the time the question was again before the court in the same case, MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696 (1916) was decided, dictating a different result. In Higgins, supra, the Circuit Court declined to follow its earlier ruling "because the Supreme Court [had] * * * directly ruled upon the precise point in the interim." 3 F.2d at 898. It may be that where one district judge relies on statutory language which unbeknownst to him has been materially and relevantly amended prior to his decision, a second district judge could properly decline to follow the law of the case doctrine. But it is unnecessary to consider this hypothesis here. There is nothing in Judge Palmieri's opinion to indicate that it was premised solely on the belief that the disenfranchising provisions existed prior to the Amendment of 1938. Indeed, the opinion makes clear that the disenfranchisement could be sustained on prior non-statutory principles. And even if this were not so, it is pure speculation to say that the court was not aware of the date on which the disenfranchising provisions of § 44, sub. a, were enacted, and its decision may well be consonant with such knowledge.

What the Limited Partners urge amounts to a clear error of law is in reality their doubt as to the wisdom of the decision. Even if we shared that doubt (and we do not) it should not prevail over the law of the case. Zdanok v. Glidden Co., supra; White v. Higgins, 116 F.2d 312, 317 (1st Cir. 1940). We are asked to indulge in exactly that type of piece meal litigation and forum shopping against which the doctrine militates. Dictograph Products Co. v. Sonotone Corp., 230 F.2d 131, 135 (2d Cir. 1956). Nor is Judge Palmieri's decision immune from reconsideration, as was the case in Dictograph.[7]

## THE DISENFRANCHISEMENT OF THE EXCHANGE AND BANKS

We agree with the referee and Judge Palmieri[8] that after the signing of the November 25th agreement Haupt was controlled by the Committee, which was in effect control exercised by the Exchange and the Banks. Section 44, sub. a excludes *other similar controlling bodies* of a bankrupt corporation from appointing a trustee. Assuming this section relates to Haupt, a partnership, a question which will eventually be decided with reference to the disenfranchisement of the Limited Partners, are the Exchange and the Banks the controlling bodies excluded by the statute? We think not.

Whether relatives of a bankrupt, its officers, directors or shareholders would be permitted to vote prior to the enactment of the disenfranchising provisions usually depended upon whether there was shown to be some collusion with the bankrupt[9] or a strong danger of it[10] or not.[11] "The amendment merely extends and makes mandatory a policy which the courts had sometimes enforced in the absence of express statutory direction." In re Latham Lithographic Corp., 107 F.2d 749, 750 (2d Cir. 1939) (dictum). The language of the statute was "employed to overturn the older tradition which allowed these classes to vote. * * *." Schwartz v. Mills, 192 F.2d

7. See note 2, supra.

8. In re Ira Haupt & Co., 234 F.Supp. 167, 170 (S.D.N.Y.1964).

9. E.g., In re Stowe, 235 F. 463 (N.D. Cal.1916).

10. E.g., In re Ballantine, 232 F. 271 (N.D.N.Y.1916).

11. E.g., In re L. W. Day & Co., 178 F. 545 (2d Cir. 1910); In re Rothleder, 232 F. 398 (S.D.N.Y.1916); In re Syracuse Paper & Pulp Co., 164 F. 275 (N.D.N.Y. 1908).

727, 729, 29 A.L.R.2d 1161 (2d Cir. 1951). It has been narrowly construed. A creditor corporation whose president and 50% shareholder was also president and half owner of the bankrupt has been permitted to vote in the election for a trustee.[12] The disenfranchisement provisions have been said to be personal in nature and would not disqualify a bona fide assignee of a claim from one disqualified due to his status as a shareholder, In re Latham Lithographic Corp., supra, nor would the original creditor be disqualified if he retained the claim and divested himself of the stock. In re Page Displays Inc., 35 F.Supp. 140 (S.D.N.Y.1940). Similarly, the relative of one who was an officer and shareholder of a bankrupt corporation has been permitted to vote. In re Universal Seal Cap Co., 40 F.Supp. 420 (E.D. N.Y.1941).

■■ It seems clear that the statute was designed basically "to prevent the election of a trustee who may be too friendly to the bankrupt and fail to protect the interests of creditors," In re Latham Lithographic Corp., supra, and

to insure more effective creditor control, i. e., "control by those whose sole interests lie with the creditor class," [13] rather than control by those whose interests lie with the bankrupt.[14] Thus, even if the Committee, and through it the Exchange and the Banks, might be considered a controlling body of Haupt[15] the circumstances of that control when considered in the light of the rationale behind the disenfranchising provisions indicate that the Exchange and the Banks should not have been disenfranchised under § 44, sub. a. The bankrupt ceased to operate as a brokerage house five days before the agreement of November 25th was signed. At that time, "Haupt was hopelessly insolvent * * * and it has not engaged in the business for which it was organized since that time. * * * * [I]ts affairs have been the subject of systematic liquidation, a course of action for which the Committee * * * and not the partnership, has been responsible." In re Ira Haupt & Co., 234 F.Supp. 167, 169 (S.D. N.Y.1964).[16] The purpose of the agreement as stated therein was to effect the

12. Schwartz v. Mills, 192 F.2d 727, 29 A.L.R.2d 1161 (2d Cir. 1951). The court felt that the language of the statute "refers primarily to individuals, [and] since a corporation cannot be a relative, officer, or director of the bankrupt * * * [it] would appear to be inapplicable to * * * the claimant corporation." Id. at 729. Contra, In re Deena Woolen Mills, 114 F.Supp. 260, 271 (D.Me.1953).

13. 2 Collier, Bankruptcy ¶ 44.01 p. 1635 (14th ed. 1964).

14. Schwartz v. Mills, supra, 192 F.2d at 732. (dissenting opinion).

15. Counsel for the Exchange and one of the Banks, Chase Manhattan, urge that the phrase "other controlling bodies" is not a catchall expansion of the restrictive enumeration of disenfranchised persons which precedes the phrase but maintain that it was inserted for the purposes of clarity and consistency with another section of the Chandler Act, citing Weinstein, The Bankruptcy Law of 1938, Chandler Act, 88–9 (1938); "Since clause (8) of sec. 1 defines 'corporations' to include unincorporated bodies the terms 'Members' and 'trustees or members of similar controlling bodies'

have, in the interest of clarity, been inserted by the Chandler Act to correspond to 'stockholders' and 'directors' of incorporated bodies." Id. at 88–9. If this is so the disenfranchisement of the Exchange and the Banks would perhaps be adding another exception to the statute directing that creditors elect a trustee. See West Hills Memorial Park v. Doneca, 131 F.2d 374 (9th Cir. 1942), and compare Schwartz v. Mills, supra, with the dissenting opinion in that case and In re Deena Woolen Mills, supra. We are not, however, satisfied that the phrase was not intended to refer to groups other than such as the boards of directors, *esjudem generis*, e. g., boards of governors, executive board, administrative board, designated by a corporation to manage its affairs, as indeed we are urged by counsel for two other of the Banks, First National City and Morgan Guaranty, who at the same time argue that the Exchange and the Banks do not by the nature of the circumstances qualify.

16. This is not to say that the cessation of business by itself would exculpate one otherwise disenfranchised by the section from the provisions of that statute.

orderly liquidation of Haupt.[17] We feel it may fairly be inferred that of at least equal concern was the preservation of public confidence in the market and the protection of the Banks' interests as creditors.[18] In proposing and acting under the agreement of November 25th, the Exchange and the Banks acted primarily for their own best interests, not for Haupt's. And in seeking to vote for a trustee they did not seek a trustee who would be principally interested in Haupt, but one who would protect the interests of the creditors, including themselves.[19] That is in accord with the purpose of having the creditors elect a trustee.[20]

Should it be contended that the trustee would be beholden to his electors or be so closely aligned with them as to preclude impartiality, he may be removed. 11 U.S.C. § 11, sub. a (17). But this question is not before us, nor was it before the referee.

Thus, the referee erred in disenfranchising the Exchange and the Banks as other controlling bodies under § 44, sub. a.

## THE LANDLORD'S CLAIM

The proof of claim filed by the Landlord consisted of three items: (1) $206,557 for rent from December 1, 1962 to March 1, 1964, and other charges (apparently for work done and materials supplied in connection with premises leased by Haupt at 111 and 115 Broadway); (2) $159,843 for rent due under a lease of premises at 111 Broadway for periods running from June 1, 1961 to June 15, 1962, and January 1, 1962 to April 1, 1963; (3) $236,150 in damages on the unexpired leases measured by one year's rent from date of surrender. The proof of claim included a statement that "a portion of said debt is evidenced by checks issued on behalf of * * * Haupt * * * payable to claimant's agent, Urban Management," and had appended four checks as follows: (a) $44.98, dated January 2, 1964; (b) $52,312.50 dated January 31, 1964; (c) $2,052.38 dated March 17, 1964; (d) $146.33 dated March 20, 1964. The schedules in bankruptcy listed the checks (schedule A–3–g) under "Payable for checks cancelled by stop payment" as being for electricity, rent, electricity and miscellaneous, respectively. The schedules also listed, under "claims not reflected in the books," (schedule A–3–d), "One Estate Inc., rent and other charges, unliquidated, estimated amount $416,814."

Of the three items of the Landlord's claim, the one for $236,150 was objected to on the grounds that it was for damages claimed by the Landlord for anticipatory breach of leases and the remaining two items totaling $466,401 were objected to on the ground that they were overstated, the objector representing that Mr. Feldman had so advised him based on the records of the bankrupt. The referee directed that the Landlord's claim be tried summarily and directed the objecting party, counsel for Manufacturers Hanover, to go forward. Mr. Feldman was called and testified. He was asked specifically about the $206,557 and $159,843 items (for rent and additional charges) and stated that they

> "do not appear * * * on the records of Ira Haupt either those which I inherited or which were in existence prior to the time when I became

---

17. In re Ira Haupt & Co., supra, 234 F. Supp. at 168 n. 1.

18. While arguing that "other similar controlling bodies" refers to members of the board of directors and groups *esjudem generis* (note 14, supra), counsel for First National City and Morgan Guaranty distinguish the creditor signatories of the November 25th agreement. They state in their memorandum: "there is no and can be no logical reason for seeking to preclude from voting those creditors who in an attempt to protect their own interests, either singly or in concert, endeavor to prevent the deterioration or dissipation of a financially embarrassed debtor * * * by directing, guiding or even controlling the liquidation of such debtor's assets in order to safeguard the creditor's interest."

19. Ibid.

20. Note 13, supra, and accompanying text.

agent for Ira Haupt or in the records which have been set up since then.

"The only liability which we have at the present time * * * is for rent accrued from December, 1963 through March 29th, 1963 (sic) up to the date when the Chapter XI petition was filed, a total of $95,615.45" (122–23).*

When asked about the $416,814 figure in the schedules, the preparation of which schedules had been supervised by him, Mr. Feldman stated that it was the amount at which the Landlord's total claim had almost been settled prior to the filing of the Chapter XI petition, and included $250,000 in "estimated damages." How the balance of $166,814 was arrived at was not made clear.[21] It seems logical to equate the $250,000 "estimated damages" portion with the Landlord's $236,150 item, which Mr. Adelman made clear was an "estimated damages" claim for money spent in preparing and making available the spaces rented to Haupt and for money to be spent to break the spaces down into smaller rentable units so that they could be relet. At the time of Mr. Feldman's testimony the checks were not discussed at all. Mr. Adelman had advised (when the referee announced his decision to try the Landlord's claim summarily) that he was not prepared to prove the claim and had no witnesses present as he had not contemplated this turn of events. After Mr. Feldman testified the referee ordered Mr. Adelman to make the claim stand up for whatever amount he could and the latter again advised that he was not prepared and would ask to be allowed to do so at a later date. After subsequent discussion concerning the merits of the claims of the Employees and others, the referee declared Seligson elected and closed further inquiry into the Landlord's claim.[22] Mr. Adelman stated:

"I wish to take exception to your ruling * * * because on the testimony here, $95,000 is admitted * * *. In addition I have checks annexed to the proof of claim for $54,000. The only thing that will require testimony is to the damage by reason of the rejection of the lease. This doesn't go to the balance of the claim and so at least 140,000 or 145,000 on the evidence as it now appears has been established." (168).

Counsel for the Exchange and one of the Banks interjected: "your honor, that is incorrect. The $50,000 check and the other check is part of the ninety-five," and Mr. Adelman replied: "It is not * * *." (168). The referee declined to reopen the argument.[23]

It is alleged that the referee erred in disallowing the Landlord's claim and/or in not allowing it to a certain extent,[24]

---

* All such references are to pages in the transcript.

21. But see note 28, infra.

22. "Referee: I am of the opinion that the parties were not prepared to substantiate the landlord's claim and in view of the fact that the ascertainment of the amount of that claim would require a trial that would consume quite some time, and in view of the fact that all of the claims other than the nine employees would also require the resolution of issues of fact and issues of law, I am going to provisionally disallow all the claims except the employees claims.

"Charles Seligson has been elected trustee on nine claims in the amount of $153,944.25; the other count being three claims for Samuel Adelman in the sum of $34,006.77." (159–60).

23. "Referee: My mistakes are on the record preserved for the District Court and as I declined to reopen argument for Mr. Freund, I will do the same for Mr. Adelman. (168–69)."

24. It is alleged in the Landlord's petition to review that the claim should have been allowed for $416,814 "the estimated amount set forth in the Bankrupt's schedules," or; $366,401 "the liquidated portion thereof," apparently the difference between the amount of the claim ($602,551) and that portion of it for "estimated damages" ($236,150), or; $345,615 "the liquidated and estimated amount thereof in accordance with the testimony of Edward Feldman," apparently the amount admittedly due for rent ($95,615) and the bankrupt's estimate of damages ($250,000) included in the proposed set-

and that he erred in refusing to grant an adjournment to permit the Landlord to prepare to establish the amount of the claim.

 There is some confusion as to whether the Landlord's claim was disallowed in its entirety or only as to any amount over $95,615. In its petition for review the Landlord states that the referee provisionally disallowed the claim in its entirety; the Limited Partners, in one of their petitions, allege error in disallowing the Landlord's claim and in another, allege that the referee erred in limiting the claim to $95,615. The referee says in one certificate that the inquiry as to the Landlord's claim resulted in provisional disallowance. The transcript reveals that on September 11th the referee appeared to have disallowed the Landlord's claim in its entirety.[25] On September 30th he indicated that he felt he had allowed the claim at least to the extent of $95,615 [26] but later said he had allowed only $34,000 for Adelman, indicating disallowance of the entire claim.[27]

There being no dispute whatever that the Landlord was owed at least $95,615, the referee erred if he disallowed the claim in its entirety. There was, in effect, an objection to only *part* of the claim. We are also troubled by the fact that there was next to no discussion on the matter of the checks on which payment was stopped. It seems clear that the Landlord included the amounts represented by the checks in his overall claim. At the same time logic dictates that the schedules did not include the checks in the $416,814 since they were listed as separate debts. We have no way of knowing whether Mr. Feldman included the $52,312 check for rent in the $95,615 he testified was the only amount owed the Landlord. Nor can we tell, if $250,000 and $95,615 was included as estimated damages and rent respectively, what made up the balance of the $416,814.[28] We are also unenlightened, as was the referee, by any statements or testimony as to where precisely the other checks came into play in the Landlord's claim or in the bankrupt's estimate of it. Under all of these circumstances we find that the referee erred if he disallowed amounts represented by the checks and any other amounts, exclusive of "estimated damages," without at the very least some explanation of where what fitted in the overall scheme of things, which could have easily been accomplished without extended hearings. Where there has been a genuine objection, the referee may, in a proper case, provisionally disallow a claim without going into extended

---

tlement, or; $166,814 "the liquidated amount * * * in accordance with the testimony of Edward Feldman and as reflected in the bankrupt's schedules," apparently the amount reflected in the schedules ($416,814) less that portion of it for estimated damages ($250,000), or; $150,171 "the aggregate of $95,615 admitted by the testimony of Edward Feldman, and $54,556 represented by unpaid checks of bankrupt annexed to the proof of claim," or; $95,615 "admitted to be due by the objectant to said claim and by the testimony of Edward Feldman."

25. Note 22, supra. The count for Adelman omits entirely the Landlord's claim.

26. "Referee. I think that the record may indicate that it was not disallowed completely. I believe that representations were made that the claim was sufficient on its face for some sum in excess of $95,000. I don't want to commit myself at this time. I believe it was in the neighborhood of $144,000. I don't have the minutes in front of me." (192–93).

27. "Referee: I only permitted some $34,-000 for Mr. Adelman." (204).

28. Although, on September 30th, Mr. Adelman explained that with reference to the attempted adjustment of the Landlord's claim, "the landlord submitted certain bills. They sent in Peat, Marwick & Mitchell * * * and after they went through it, they came to an amount and the amount was $93,000 up to December. Then the rest were January, February and March, or another seventy-three thousand dollars. So he had a total of $166,000 and the $250,000, which Mr. Feldman insisted that he have * * * [appraised] before he approved it, finally got that." (194–95).

hearings,[29] but not where, as here, the objections and the circumstances are unintelligible.

As to the remaining part, the referee disallowed it and refused to grant an adjournment to permit the Landlord time to put in evidence to establish it.

 Where a claim, valid on its face, is presented it should be allowed to vote unless objected to. Where a sufficiently explained objection [30] is interposed the referee may, in his discretion provisionally disallow the claim, In re Pan-American Match Co., 242 F. 995 (D.Mass.1917), or proceed to a hearing on the objection, e. g., In re Rosenfeld-Goldman Co., 228 F. 921 (D.Mass.1915) but may not ignore the objection and allow the claim, In re Malino, 118 F. 368 (S.D.N.Y.1902). While he may order a continuance for the purposes of having a complete hearing on the objection, In re Flexible Conveyor Co., 156 F.Supp. 164, 173–174 (N.D.Ohio 1957); In re Rosenfeld-Goldman Co., supra, he is not obliged to do so and may conduct a summary investigation which, where it is adequate for the determination, e. g. In re Hartman-Blanchard Co., 278 F. 747, 748 (N.D.N.Y.1922), may result, depending upon the circumstances, in allowance or disallowance and that determination will not be set aside unless manifestly unjust. In re Rosenfeld-Goldman Co., supra, 228 F. at 924. While the cases point out that it is the objection and not the claim which is pointed out for a hearing and determination [31] this merely means that the initial burden is on the objector to show why the claim should not be allowed. The claimant should, of course, be given the opportunity to participate in the overall determination of the validity of the claim for the purposes of voting. Analogously, since the objector may be required to go forward with his objection immediately under proper circumstances [32] we see no reason why, under the circumstances of this case, the claimant may not be required to respond in like time.[33] There was testimony that a real estate expert had sub-

---

29. In re Pan-American Match Co., 242 F. 995 (D.Mass.1917). "Objection having been made * * * it was discretionary with the referee, either to delay the election and go into the objections sufficiently to determine whether the claims should be voted, or to suspend the claims and go forward with the election without them." Ibid. See also, In re Malino, 118 F. 368 (S.D.N.Y.1902), where the court, holding that a claim may not be allowed to vote without some consideration being given to objections which are apparently genuine, stated: "While the selection of a trustee can not be tied up indefinitely * * * and in proper cases provisional allowances or disallowances may be made in order that a trustee may be expeditiously selected nevertheless the proceeding should not be so summary as to exclude the consideration of all objections." Ibid.

30. We may presume that merely exclaiming "I object" is not enough. Cf., In re Malino, note 29, supra, "[I]t does not rest in the discretion of the Referee to allow claims as voting bases when objections are made, *which are apparently genuine.*" (Emphasis added.) Ibid. See also, In re Gloria Vanderbilt-Sonia Gowns, 26 F.Supp. 766 (S.D.N.Y.1938).

"The record discloses no attempt on the part of the objectors to go beyond the mere assertion that the Vanderbilt claim was invalid." Id. at 768.

31. In re Gloria Vanderbilt-Sonia Gowns, note 30, supra, quoting in re Century Silk Mills, Inc., D.C., 296 F. 713, 714: "A sworn proof of claim would ordinarily be prima facie evidence requiring an objector to go forward. It is the objection, not the claim, which is pointed out for hearing and determination." 26 F. Supp. at 768. See also, In re Flexible Conveyor Co., 156 F.Supp. 164, 173–174 (N.D.Ohio 1957).

32. In re Gloria Vanderbilt-Sonia Gowns, note 30, supra. There the referee's direction that the objector go forward immediately and his refusal to grant a short adjournment did not amount to an abuse of discretion where a) the request for an adjournment came after the referee's selection of a disinterested trustee, and b) there prevailed an atmosphere of general antagonism at the meeting.

33. Cf., In re Eisenberg, 251 F. 427 (S.D.N.Y.1918), where a request for an adjournment to allow correction of a proof of claim objected to as deficient on its face was denied. The denial was upheld

mitted an opinion relevant to the proposed settlement of the Landlord's claim, specifically, we may presume, with respect to the "estimated damages." In response to the referee's statement that to determine the amount for which the claim should be allowed would require a trial with an expert real estate opinion, Mr. Adelman said "it may require the landlord to have somebody here to testify to that effect." (130). Additionally, the atmosphere was, we feel from viewing the transcript, one of general antagonism with objections and counter-objections to virtually every claim portending a drawn out, perhaps bitter, proceeding.[34] Taken by itself, the hearing on this part of the Landlord's claim was not inadequate for the determination made, which was, simply, that there was a genuine dispute which would require an extended trial with expert testimony. In other words, the hearing that was held disclosed that an extended hearing would be necessary.[35]

While the permissible direction for immediate trial might perhaps have been more properly directed at the objectors, In re Gloria Vanderbilt-Sonia Gowns, 26 F.Supp. 766, 768 (S.D.N.Y.1938) the decision to provisionally disallow this portion of the claim without an adjournment was within the discretion of the referee [36] and "will not be set aside unless it amounted to a plain error of law or an abuse of discretion," In re G.E.C. Securities, Inc., 331 F.2d 655, 656 (2d Cir. 1964), and under the circumstances we find neither.

### THE EMPLOYEES' CLAIMS

The so-called "nine former employees" (Employees) filed proofs of claim, six on July 16, 1964 and three on September 9, 1964, alleging debts in various amounts totaling $153,944.25. The consideration for the debts was expressed in the proofs by all of the employees as follows:

"Claimant was employed as a member of the so-called 'Pennsylvania Group,' a group of employees in the Bond Department of the bankrupt primarily concerned with the underwriting and sale of tax exempt bonds issued by various Pennsylvania Authorities. The debt for which claim is here made represents the balance of compensation due claimant for the year 1963."

At the meeting on September 11th, after the testimony of Mr. Feldman relevant to the Landlord's claim, the referee announced his intention to hear the remaining objections and rule on them, with or without evidentiary support from the claimants who would be called upon to prove their claims to the extent they had been objected to. There followed a recess, some preliminary discussion and another brief recess; [37] upon resumption an

---

however, only because the request was made subsequent to the election, and this reason would not be applicable to the instant case since under the procedure outlined by the referee, the proper time for objections and, it follows, requests for adjournment to meet the objections, was after the election.

34. See note 32, supra.

35. See In re Hartman-Blanchard Co., 278 F. 747, 748 (N.D.N.Y.1922).

36. In re Pan-American Match Co., note 29, supra. "[N]othing * * * can be more a matter of discretion than the allowance or refusal of a continuance." In re Grat, 228 F. 925 (D.Mass.1915). "Whether the referee will or will not postpone the election of a trustee, where claims are objected to, is a matter of sound discretion." In re Evening Stand-

ard Pub. Co., 164 F. 517, 519 (N.D.N.Y. 1908).

37. After the first recess, Mr. Freund, counsel for the Limited Partners, requested ten more minutes or, apparently in the alternative, an adjournment. (136). At the same time he stated that he intended to start with his objections to the Employees' claims and there followed a brief discussion concerning the procedure to be followed and the propriety of Mr. Feldman being called to testify:

"Referee: But the claim supports itself. It is incumbent upon somebody to come forward.

"Mr. Freund: If Mr. Feldman is around I will put him on the stand and show that they are not on the books of the company.

apparent request for an adjournment by Mr. Freund, counsel for the Limited Partners, was denied.[38] Mr. Freund then again asked [39] to put Mr. Feldman on the stand to testify with respect to the Employees' claims and the referee directed that Mr. Freund first state his objection to the claims on their face and he, the referee, would rule on them.[40] Mr. Freund objected to the Employees' claims on the ground that they were deficient on their face in that they did not state the bases for the claims.[41] The referee overruled the objection and refused to allow Mr. Freund to call Mr. Feldman as a witness after Mr. Freund stated that he could not represent aforehand that Mr. Feldman had investigated the claims and had concluded they were improper. The referee refused to permit Mr. Freund to "find out in short order

what the facts are," since he was "in effect * * * asking for an adjournment of the election to ascertain whether there is some basis of objection to these claims." (141). The referee noted that the claims had been on file for months and objectors could have examined them and exercised rights of discovery and inspection.[42]

It is alleged that the referee erred (1) in refusing to hold the Employees' claims invalid on their face, (2) in refusing to permit Mr. Feldman to be examined as to the merits of the claims and (3) in refusing to grant an adjournment so that evidence could be submitted to show that the claims were invalid.

We believe that if the proofs are sufficient on their face the referee did not abuse his discretion in refusing to permit

---

"Referee: If he can testify that he has examined the books for these claims * * *.

"Mr. Freund: I will look at the schedules that were filed then.

"Referee: But this isn't sufficient * * *. Let me ask you this; can you now present those claims which you feel are deficient on its face?

"Mr. Freund: I would need another ten minutes.

"Referee: All right, four o'clock gentlemen." (136–38).

38. "Mr. Freund: If your Honor please * * * the hour is late. I have tried to concentrate on the larger of the claims which I think can be disposed of * * * I don't know if it can be disposed of tonight, but certainly in fairly short order and * * * we will bring the books and records and I am sure we can get through with it very quickly.

"Referee: [A]s I said before, I feel that we should have a trustee at the earliest possible time * * * if I can, within the framework of the Act, I intend to see that we have one today or find out that there is no election." (138–39).

39. See note 37, supra.

40. "Mr. Freund: If your Honor please, I would like to put Mr. Feldman on the stand and then I will make my objections and ask him the questions.

"Referee: Do you have objections to the face of the claims?

"Mr. Freund: Yes I have.

"Referee: We don't need Mr. Feldman

for that. Perhaps I can give you rulings on that."

41. These claims had been attacked earlier by the same counsel when he had stated his objections for the record as to the Seligson claims. His objection initially was rather vague—that the claims "are not being voted in the interests of the estate, and I don't know [in] what category it comes * * *." (92)—but was bolstered by the specific objection of Mr. Adelman that the claims failed to state a claim on their face with requisite specificity. (93). At that time it was explained by counsel for the Employees in less than graphic terms that the amounts claimed were to be drawn against a fund set up by Haupt and did not represent bonuses, but were "in effect their wage allocated on the basis of the fund that they drew during the course of the year from the operation of their particular department." There was no agreement in writing. (95).

42. At the subsequent meeting of September 30th, counsel for the Limited Partners correctly pointed out that three of the nine claims had been filed only two days before the September 11th meeting (203) and this is repeated in their memorandum at p. 34–5. Without passing on the merits of the referee's reliance on the length of time the claims had been filed, we find the counter-argument without merit, since the nine claims varied only in amount and six had been on file since July 16th.

Mr. Feldman to be called. Counsel stated that the purpose was to find out "what the facts are" and he would be, as the referee states in his certificate, engaging in a "fishing expedition." We find, however, that the proofs, if considered on their face and on their face alone, are deficient. While the rule of In re Louis Elting, Inc., 4 F.Supp. 732 (S.D.N.Y. 1933) [43] and the cases cited therein, upon which petitioner in large measure relies, was modified by the Second Circuit in Schwartz v. Mills, 192 F.2d 727, 29 A.L. R.2d 1161 (2d Cir. 1951) [44] the consideration as stated does not supply the creditors "with enough information as to the circumstances giving rise to the debt to be able to test and pass on its validity, legality, and substantial accuracy." 192 F.2d at 730. The question is, however, were the creditors harmed by the succinctness of the statement. Under the functional test of Schwartz, the court in that case, with reference to the facts before it, said:

"It does not appear that the petitioning creditors * * * were actually harmed or misled by the succinctness of the statement. Any deficiency in knowledge was in fact supplied during the creditors' meeting. Schneider [president of the bankrupt] testified to his personal knowledge of loans * * * [and] that the company books showed the bankrupt owed claimant approximately $93,-000 * * *. In addition there was offered the report of accountants for the creditors' committee showing the exact amount claimed as disclosed in the bankrupt's books. This was excluded by the referee without statement of reasons. Had the proceedings resolved themselves into a trial on the merits as to the validity of the claim, such evidence might have been considered hearsay. Under the circumstances here, we think it available to supplement the ex parte statement of the Proof of Claim. * * * Petitioner did not assert that no claim at all existed or suggest fraudulent transactions between the claimant and the bankrupt. Nor did he request adjournment to make a formal attack upon the claim. Its allowance for the purpose of the vote was therefore not error." 192 F.2d at 730–731.

While the September 11th meeting ended with allowance of the Employees' claims without testimony of the bankrupt's representative,[45] the matter was not ended. At the subsequent meeting of September 30th counsel for the Limited Partners applied to reopen the election and offered to prove that the Employees' claims were tainted with fraud. The referee allowed examination of an associate of the law firm representing the Exchange and one of the Banks on the question of solicitation and then allowed Mr. Freund to examine Mr. Kammerman, the managing partner of Haupt. There was an objection by Mr. Younger, counsel for the Employees, to the examination on the grounds that such examination would actually be a hearing on the merits of the claim, but the referee, while agreeing

---

43. The referee, whose opinion was adopted by the district court, stated: "proofs of claim are not sufficient for allowance and voting if they fail to set forth the alleged consideration upon which the claims are based with sufficient particularity * * *. [a] proof of claim * * * must state with meticulous care the consideration of the claim." 4 F. Supp. at 733.

44. "Some of the older cases do speak in terms of a detailed statement, compiled 'with meticulous care,' of the consider-ation for the claim. * * * [w]e think the better rule is that no error will lie if there was reasonable ground for the allowance. * * * Hence a Proof of Claim should be held to comply with the requirement for statement of the consideration if the creditors * * * are thereby supplied with enough information as to the circumstances giving rise to the debt to be able to test and pass on its validity, legality, and substantial accuracy." 192 F.2d at 730.

45. See note 22, supra.

that such indeed would be the case, overruled the objection.[46]

Mr. Kammerman testified that he knew the compensation arrangements of Haupt with each of the Employees and that the amounts claimed by each were not due. On cross-examination by Mr. Younger the witness testified that a Mr. Auster, a partner in Haupt, supervised the work of the nine Employees, who were part of the "Pennsylvania Group" of the bond department. He explained that the "Pennsylvania Group" was engaged in underwriting Pennsylvania municipal bonds; profits on such transactions resulted from the difference in the price at which Haupt bought and sold the bonds. He admitted that Haupt very often would head a syndicate with respect to the underwriting of Pennsylvania bonds and in these circumstances the syndicate manager would get more than a proportionate share of the profits, a management fee. Mr. Kammerman, with reference to his statement that he was familiar with the compensation arrangements of the members of the "Pennsylvania Group," said: "Yes, I had to approve them * * * If there was any request for an increase, it would have to be approved." (291–92). He was next asked: "why don't you explain for us what the compensation arrangement for the members of the Pennsylvania Group was for the year 1962. Now that is the year for all of which you were the managing partner; is that correct?" Mr. Kammerman responded:

"Yes, I was, but * * *" and was cut short by the referee who adjourned the hearing until October 23rd.[47]

On October 5th the referee called a meeting for October 6th and on the latter date approved the appointment of Mr. Seligson as trustee and further adjourned the hearing scheduled for October 23rd to October 30th. On that date the cross-examination of Mr. Kammerman continued. It is unnecessary to repeat the testimony of Mr. Kammerman or that of Mr. Hensley and Mr. Schulman, two of the nine Employees who also testified, in any great detail. The members of the "Pennsylvania Group" at the end of each year divided among themselves approximately one-third of the profits generated by their activities. Whether it was called "bonus" or whatever it is clear that it was claimed by the Employees as moneys they considered to have been earned by them. True, the precise amount each employee was to receive was the subject of some negotiation between the employee and the head of the group, but that does not preclude a claim to it as of right. Rather, the negotiations seem to have been to determine the precise amount generated by each employee in conjunction with the efforts of others in the group. The negotiations were among members, including the head of the group, and not as to the amount the group as a whole was to receive. Mr. Kammerman admitted this arrangement. His prior testimony was based on salary only and the record makes clear that he felt, or at least so responded in depositions,

46. "Mr. Younger: If your honor please * * * pending * * * is Mr. Freund's application to put Mr. Kammerman on the stand. Of course, standing alone, I have no objection at all to that.

"I wonder if your Honor understands quite clearly, however, that Mr. Freund's putting Mr. Kammerman on the stand to testify not with respect to any possible solicitation of the nine claims or any other claim, but really with respect to the merit of those nine claims. I don't think this accords with your Honor's statement as to how we are to proceed. "Referee: You can correct on that

* * * but as I understand it, he is submitting it in support of his application to reopen the election of the trustee on the ground that it was procured by fraud. An application of this sort should be given priority and top priority at that." (274).

47. "This will be adjourned to October 23rd at ten o'clock. For the record, we will resume with the taking of testimony on Mr. Freund's application to vacate the order which permitted the nine claims to be voted on the ground of fraud. We will then pass to the question of solicitation, where Mr. Adelman had left off * * *." (292).

that he considered salary the extent of Haupt's legal liability, and inferentially, that the money received at the end of the year was bonus, not salary. There was testimony to the effect that the bonus arrangement had been discussed at the time of employment. Hensley testified that during 1962 he had received $11,400 and at the end of that year received an additional $7,500. Schulman testified that he received distributions during the year in excess of his salary:

"If I wanted five thousand dollars, I would go up to whoever was in charge of the department * * * and I would say that I wanted five thousand dollars. He would say 'Let me see what's in the reserve.' He would say to me 'when do you need it' and I would say, 'right away,' and inside of a few days I would get a check. And I did that many times during the year." (458).

Mr. Kammerman testified that the bonus was not necessarily paid at the end of the year. It was paid at any time during the year. When asked how it would come about that they would pay it during the year, Mr. Kammerman explained:

"Well, Mort Auster would come to me and say that Bill Bruins or someone like that wanted a thousand dollars, he needed it, 'and this is what the fellow earned last year; this is what he's earned so far this year; and this is, I think, what we are going to pay him at the end of the year. Is it okay if we give him a check?' and I would say, 'Yes.' " (333).

The referee, at the end of the testimony of the witnesses, indicated that he felt the claims were bona fide and directed Mr. Freund and Mr. Younger to settle an order, with proposed findings, conclusions and memoranda.[48] Mr. Freund again brought up his motion to reopen, stating that the background of the Employees' claims could easily have been stated in the proofs and if such had been done, the referee, he felt, would not have allowed the claims, and by not so doing the creditors were prevented from inquiring into them. The referee declined to reopen and asked the attorneys about preparing an order along the lines the referee had indicated. Mr. Freund suggested they await decision on the petitions for review. The referee marked the hearings closed with Mr. Freund and Mr. Younger to submit as requested at whatever time they could work out between themselves. The meeting was adjourned to December 16th, at which time the timetable for the memoranda would be disclosed and worked out. The hearing on the issue of solicitation was adjourned to November 25th. On that date the question of solicitation was heard (or

48. "Referee: What I want to do is give you the benefit of my thinking at this time—not a ruling * * * and then I will ask you [Mr. Freund and Mr. Younger] what you feel should be done toward the entry of an appropriate order on this application. Now, as I understand your application, Mr. Freund, it is in effect to vacate the election, because it was based upon the employees' claims, and, as I understand it, you contend that there is something in the nature of a constructive fraud here * * * that the claimants could not have believed that they could be allowed in the amounts thereof. No, we are not faced with any problems of invalidity on the face of the claims. If I was wrong on that I will be corrected in the District Court."

(523–24). The referee went on to state that whether the employees would recover would be taken up ultimately on a trial of the claims similar to what was done that day. The question before the referee as he saw it was whether he was so shocked at their temerity in presenting the claims that the election should be voided.
"Referee: My feeling is that they were bona fide * * * the application is without substance. I am not so ruling. I just wanted to give you * * * and Mr. Younger the benefit of my thinking, and it seems to me that what is appropriate is to ask you to settle proposed findings and conclusions with an appropriate memorandum of law." (525).

not heard depending upon the point of view one adopts) and culminated in a ruling that there was no improper solicitation, leaving the order to be submitted. As of the present date, no order has been entered on the referee's decision of October 30th re fraud, or on his decision of November 25th, re improper solicitation.

It is true that in the instant case, unlike the facts in *Schwartz*, supra, the petitioning creditor did request an adjournment and did in effect assert that no claim existed at all, and that, initially, the bankrupt's representative was not permitted to testify. But there was a hearing on the assertion that no claim at all existed, and that hearing was at the same time a hearing on the merits of the claims,[49] with testimony by the bankrupt's representative. In effect, the request for an adjournment to permit the bankrupt's representative to testify was granted. Had the testimony of Mr. Kammerman been adduced at the September 11th meeting we feel it would not have been error for the referee to have allowed the claims following such testimony. Indeed, Mr. Kammerman's testimony goes far to establish that there was indeed a contractual arrangement of sorts.

■ The problem becomes, then, one of chronology. Should we disregard all the testimony of September 30th and October 30th with respect to the Employees' claims and consider only what happened on September 11th? We think not. Indeed, counsel for the Limited Partners would have us consider the damaging testimony of Mr. Kammerman of September 30th [50]—but that testimony cannot be properly evaluated except in light of his and other subsequent testimony on October 30th. Since we may properly receive further evidence to determine the correctness of the result reached by the referee [51] we see no reason why we might not likewise consider evidence adduced before the referee although subsequent to the election (as was the testimony of September 30th and October 30th) and to the referee's approval of the trustee (as was the testimony of October 30th).

## THE REFEREE'S APPROVAL OF THE TRUSTEE

On October 5th, while the inquiry and hearing on the questions of fraud and solicitation were pending,[52] the referee notified all parties who had appeared at the September 30th meeting that they were to meet again the following day.[53] On October 6th the referee advised all parties present that

> "Mr. Feldman informed me of the fact that there is a possibility of a real jeopardy to the estate if the rights against the insurance company are not pursued at the earliest opportunity.

49. Note 46, supra, and accompanying text.

50. Before us initially together with the four petitions for review was a motion by counsel for the Limited Partners for an order directing the referee to certify the transcript of September 30th. The certification was so ordered on December 9, 1964.

51. In re G. E. C. Securities, Inc., 223 F. Supp. 861 (S.D.N.Y.1963), aff'd, 331 F. 2d 655 (2d Cir. 1964), and the cases cited therein.

52. See note 47, supra.

53. As to whether the parties notified on October 5th were at the time told the purpose or agenda of the October 6th meeting, the referee, in the certificates filed by him, states that the parties "were notified that the adjourned hearing on approval of the trustee's appointment was advanced from October 23, 1964, to October 6, 1964." Mr. Adelman does not raise the issue in his petition but in his memorandum states that the referee's secretary called him on October 5th and advised him of the October 6th meeting and he "inquired as to the purpose of the hearing, but was not advised of same, except that no witnesses need appear as there would be no testimony taken."

"I was informed that the insurers have waived the requirements of an immediate filing of a proof of claim, subject only to the proviso that they would retain the right to disclaim in the event that they could show they had suffered prejudice by reason of the delay.

"Accordingly, I asked all of the parties * * * to appear today on the question why I should not approve the appointment of Charles Seligson at this time, subject to his removal in the event the issues that are raised on the two motions of Mr. Edelman (sic) and Mr. Freund should be resolved in such a manner as would require that removal." (297–98).

The referee also stated that

"this is not an adjourned first meeting. I gave some thought to that problem before I asked that this meeting be called this morning. This is an advanced hearing that had been adjourned to the 23rd, to be held simultaneously with the adjourned first meeting, and it was my opinion that the only parties to these hearings were the parties who had appeared and participated at the adjourned first meeting." (306).

Alternative proposals and recollections of and objections to what had transpired to date together with objections to what was about to transpire abounded ad nauseum. Finally, the referee was able to reach a time when he could and did call Mr. Feldman to testify as to the urgency supposedly existing. Basically, the testimony concerned the fact that the insurance carriers had already extended the time within which the proofs of claim were to be filed but in so doing had reserved their rights to claim, as a defense, any prejudice resulting from the delay. The last extension was to expire December 31, 1964. The testimony of the witness did not appreciably interfere with the polemics of counsel. Ultimately the referee approved the appointment of Mr. Seligson and entered an order on that date.

In addition to the alleged errors hereinbefore discussed, it is further alleged that (1) the advanced meeting held on October 6th was contrary to the provisions of the Bankruptcy Act and the General Orders; (2) the order of October 6th approving the trustee was contrary to the procedure previously outlined by the referee; (3) the approval of the trustee subject to removal was an abuse of discretion, and (4) it was error to approve the appointment before the conclusion of the hearing on the questions of fraud and solicitation.

The referee had several times stated that the order in which the several matters would be taken up was as follows: (1) nominations, (2) voting, (3) objections to the claims voted, i. e., capacity of the voters, the quality of the claims, solicitation and other impediments, and (4) consideration of the competency and capacity of the trustee appointed by the creditors. (27–28, 40, 148). The approval of Charles Seligson before the completion of the hearings on the questions of fraud and solicitation obviously was a deviation from the order prescribed although we are unable to find in the record that the referee stated specifically that the hearings were to be concluded prior to the approval. We agree also that by approving the trustee the inquiry into matters which might bear on whether the trustee should be approved or not became one which might bear on whether the trustee should be removed. For his contention that this may not be done the petitioner relies principally on dictum in the case of In re Paramount Publix Corp., 68 F.2d 703 (2d Cir. 1934) where it was said: "The duty of approval or disapproval * * * is an entirely different duty from the duty of removal. A procedure which assimilates the former to the latter is not permissible." Id. at 705.

While Rule 14(d) of the Bankruptcy Rules of this court then in effect [54] permitted the referee, on his own initiative or at the request of a party in interest, to make inquiry as to solicitation and Rule 14(a) directed disapproval or removal where the trustee's election was procured by votes cast in the interest of the bankrupt or in any interest other than that of the general creditors,[55] it is nowhere required, as the petitioner contends, that a hearing on the question of solicitation be concluded before the referee may approve the appointment of a trustee. It is within the sound discretion of the referee to determine at what point the trustee should be approved or disapproved. The court in *Paramount* clearly indicated that the question is not what was done but whether what was done was under the circumstances an abuse of discretion. 68 F.2d at 705. In that case the referee refused to permit any inquiry into the qualifications of the trustees and his approval "was merely formal, proceeding on the theory that the all important thing was to have the trustees elected and to postpone a test of their disqualification." *Ibid.* In the instant case testimony had already been taken, on September 30th, on the question of solicitation of the Employees' claims which failed to show any impropriety.[56] In addition, it was shown

54. "The referee, at his own instance, or at the request of any party in interest in the proceeding, may make, or permit inquiry to be made, as to the solicitation of claims voted, or to be voted. If upon such inquiry, it appears that any claim, power of attorney or proxy has been solicited with the intent or purpose of voting such claim at any meeting or hearing in the interest of the bankrupt, or in an interest other than that of general creditors, or, if it appears that any claim, power of attorney or proxy has been solicited, and such claim is being voted at any meeting of creditors by an attorney at law, the referee shall not allow the voting of such claim under such power of attorney or proxy. If, in the opinion of the referee, the election of the trustee, or the determination of the matter to be submitted, is affected by such disallowance, the referee may adjourn the meeting and notify the creditor who executed such power of attorney or proxy of the adjourned date of meeting, to afford him an opportunity to attend and vote or to execute a new power of attorney or proxy designating some other person." This rule, unchanged, has since been renumbered Rule 15(d), Bankruptcy Rules of United States District Courts for The Southern and Eastern Districts of New York. (November 1, 1964).

55. "The appointment of any trustee in bankruptcy or of the official creditors' committee selected at any meeting of creditors as provided in the Bankruptcy Act whose election or appointment shall have been procured by votes cast under powers of attorney or proxies in the interest of the bankrupt, or in any interest other than that of general creditors, shall be forthwith disapproved, or the trustee shall be removed and the appointment of such committee shall be set aside, and such powers of attorney or proxies shall not thereafter be voted for any purpose by the holders thereof." The rule has since been renumbered Rule 15(a) and changed to read as follows: " * * * shall be forthwith disapproved. For such cause and upon notice the trustee shall be removed and the appointment of such committee set aside. Such powers * * *."

56. The transcript and the memoranda filed make clear that the claim of improper solicitation of the Employees' claims by the Exchange and Banks is based on the ground that the election was bankrupt controlled, since the Exchange and Banks had been held to be "other controlling bodies" of the bankrupt. Since we here hold that the Exchange and Banks were improperly disenfranchised under § 44, sub. a the logic of the argument falls. In addition we fail to find that the testimony adduced, either at the September 30th meeting or thereafter, compels a conclusion that there was any solicitation at all, or that the votes of the Employees were cast for any interest other than that of the general creditors. It is worthy of mention, too, that the parties contesting the approval of Mr. Seligson's appointment, i. e., the Limited Partners and the Landlord, have made clear that there is no connection between Mr. Seligson and the alleged solicitation of the Employees' claims or their alleged fraudulent imposition, other than the fact that Mr. Seligson was the choice of the Exchange and

that delay in filing proofs of claim under the insurance contracts could be detrimental to the estate. That the insurance companies had extended the date within which proofs had to be filed to December 31, 1964, did not necessarily diminish the need for the prompt approval of a trustee. The complexities of the insurance claims might require the time indicated to prepare the proofs. We don't know. As to the pendency of the hearing on the claim of fraud at the time of the approval, we see no reason, under all of the circumstances, why it must be an abuse to approve subject to removal.[57] 11 U.S.C. § 11, sub. a (17).

The opponents of the Landlord's petition for review have not seen fit to reply to the allegation that the meeting of October 6th was not properly noticed. We believe that claim to warrant discussion. Section 55, sub. a of the Bankruptcy Act provides that the first meeting of creditors shall be held not less than ten nor more than thirty days after the adjudication. 11 U.S.C. § 91, sub a. Section 58, sub. a (3) provides that the creditors shall have at least ten days notice by mail of all creditors' meetings. 11 U.S.C. § 94, sub. a (3). General Order 25 permits the referee to call a special meeting when necessary, "specifying in the notice the purpose for which it is called." General Orders, following 11 U.S.C. § 53. While General Order 25 does not prescribe how much notice must be given, Section 58, sub. a (3) requires ten days notice of *all* creditors' meetings. The referee, at the meeting of October

6th, advised that "this is not an adjourned first meeting * * * this is an advanced hearing * * *" (306). In his certificate he states: "The first meeting of creditors which had been adjourned to October 23, 1964 was not advanced to October 6, 1964. Only the hearing on approval of the appointment of trustee was advanced to October 6, 1964. The only question before the undersigned, on October 6, 1964, was whether I should approve the appointment of Charles Seligson * * * the *appointment* of a trustee is the act of the creditors; the *approval* of the appointment of a trustee by creditors is a judicial act."

It is clear that if the meeting of October 6th was a creditors meeting, special or otherwise, notice was required and calling it an "advanced hearing" is an exercise in futility. But there is merit to the referee's claim that the approval of the appointment of a trustee is a judicial act [58] and if such be the case the notice requirements would not be applicable.[59] While at first ·glance it appears that a "special meeting" was called, in substance what the referee did was to notify the parties that he was about to approve the trustee, a judicial act, and give them the opportunity to appear and express their views.[60] Under these circumstances we hold the notice requirements are inapplicable, but, in either event, in the absence of a showing that the creditors were in some way prejudiced or that the referee acted arbitrarily,[61] the order approving the appoint-

---

Banks. Both petitioners have praised the ability and integrity of the trustee. Their protestations then, seem to be to form rather than substance.

57. See the discussion of the merits of the Employees' claims, supra.

58. Bankruptcy Act § 2, sub. a (17), 11 U.S.C. § 11, sub. a (17); see also, 1, 2 Collier, Bankruptcy ¶¶ 2.68–.69, 44.06–.10 (14th ed.).

59. The notice requirement of § 58, subd. a (3) "does not . . . include proceedings where the referee or judge acts

independently of creditors." 3, Collier ¶ 58.08.

60. See note 53, supra.

61. A spectre of prejudice is raised by the Landlord in its memorandum in support of its petition wherein it is stated: "although many notices are sent out to creditors, only some of them appear by attorneys and note their appearance. Many others vitally interested in the estate may be present. All they know is what is stated in the notice of the first meeting * * *. Thereafter the only notice they get is by announcements made in open court at the conclusion of the

ment of the trustee will not be set aside on the technical objection raised. Cf., In re Sherman Plastering Corp., 340 F.2d 915 (2d Cir. 1965).

### CONCLUSION

Although we have held the Exchange and Banks to have been improperly disenfranchised under § 44, sub. a, that does not, as those petitioners claim, render moot the other issues raised since there were pending against these parties other objections, raising questions of liquidity and of preferences received,[62] objections which must be carefully evaluated before allowance for payment or, in the event a new election becomes necessary, voting. We have held the Employees' claims properly allowed. It remains for the ref-

eree to inquire further into the objections to the Landlord's claim and determine and report on the amount for which it is allowable.[63] If that amount should exceed the amount of the Employees' claims there will be a standoff with neither Mr. Adelman nor Mr. Seligson having a majority in number and amount and the referee may, indeed, if the atmosphere heretofore prevalent continues, should, make the appointment. 11 U.S.C. §§ 11, sub. a (17), 72, sub. a.

As to those other matters raised in the petitions not hereinbefore discussed, the referee's rulings are affirmed.

These are orders. No settlements are necessary. Affirmed.*

first meeting, or any adjournments thereof." But, there is nothing further offered to sustain a claim of probable prejudice.

62. See note 4, supra. The referee provisionally disallowed all claims objected to with the exception of the Employees' claims. It is specious to argue that since the claims of the Exchange and Banks had been disallowed under § 44, sub. a a reversal of the disenfranchisement would require allowance. The referee in his certificate states that he did not pass on allowance for voting purposes of those claims which he held to be disqualified. And we must assume that if the stand-

ard for provisional disallowance was, more or less, that claims had been objected to, it would be uniformly applied.

63. Since the amount, if any, for which the Landlord's claim was allowed is unclear we feel it would be improvident to set aside the order at this time. Thus, we remand for further inquiry in accordance with General Order 47.

* Since the filing of this opinion, Judge Palmieri's decision with reference to the disenfranchisement of the Limited Partners (see note 2, supra) has been affirmed by the Court of Appeals, April 6, 1965, Klebanow v. Chase Manhattan Bank, 2 Cir., 343 F.2d 726.