**In the Matter of IRA HAUPT & CO., a Limited Partnership, Bankrupt.**

**In the Matter of IRA HAUPT & CO., a Limited Partnership, Debtor.**

United States District Court
S. D. New York.

Aug. 11, 1964.

Krause, Hirsch, Gross & Heilpern, Delson & Gordon, New York City, for debtor and debtor-in-possession; Sydney, Krause, George J. Hirsch, Norman Moloshok and Charles Singer, New York City, of counsel.

Rosenman, Colin, Kaye, Petschek & Freund, New York City, for petitioners, Bernard Klebanow, et al.; Max Freund, Jerome E. Sharfman and Joseph Zuckerman, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for The Chase Manhatten Bank, a creditor.

PALMIERI, District Judge.

This litigation arose out of the financial disaster which befell Ira Haupt & Co. (Haupt) as a result of the so-called salad oil scandal in November 1963. The facts are substantially as follows:

Haupt was a limited partnership with sixteen general partners and thirteen limited partners. It was engaged in a general brokerage and commission business with its principal place of business in New York City, with a number of branches throughout the country, and utilizing the services of approximately seven hundred employees. Morton Kamerman, a general partner, was, under the partnership agreement, the sole managing partner during its term and sole liquidating trustee after the expiration of that term on December 31, 1963.

As a result of certain transactions with Allied Crude Vegetable Oil Refining Co., Haupt, on November 18, 1963, found itself in dire financial straits. On the following day, Haupt informed the New York Stock Exchange that it lacked the ratio of assets to liabilities required by the Exchange's rules and by the Securities Act of 1934. Haupt was suspended by the Exchange from further operations on November 20, 1963.

On November 21, 1963, the extent of Haupt's capital deficiency was in the neighborhood of twenty million dollars. In an effort to afford a rapid accommodation for valid customer claims and the curtailment of all unnecessary expenses, and in order to preserve public confidence in the stock market, the Exchange and Haupt's creditor banks entered into an agreement whereby the Exchange would advance a fund to pay the Haupt creditors—20,000 customers among them—and the banks would defer their claims against Haupt to the extent of two dollars for every dollar advanced by the Stock Exchange.

This agreement, clearly setting forth its purpose as one of "orderly liquidation," [1] was proposed to the Haupt general partners on November 25, 1963, when the deficit had grown to over twenty-five million dollars. They were told that no promises were being made about their debts, and it was made clear that they would continue to be obligated to the crediors as general partners. The agreement was signed providing for appointment of a Committee on which the Exchange and the banks were equally represented. James P. Mahony, Chief Examiner of the Exchange, was named "Liquidator," with broad powers of attorney signed by all the general partners, and which were attached to the agreement. The Committee was chaired by a Vice President of one of the banks, and counsel to it and Mr. Mahony was a law firm which has long represented the Stock Exchange and one of the banks.

During the period of liquidation, Mr. Kamerman was engaged by Mr. Mahony to assist in the liquidation of Haupt but he made no decisions, merely following Mr. Mahony's directions.

The Exchange advanced $7,500,000 at the time of the agreement and an additional $2,000,000 by March 10, 1964. By early March, 1964, all but about 100 or 150 of the 20,000 customer accounts of Haupt having been satisfactorily liquidated, the Committee entered into a supplemental agreement with the general partners, effective March 10, 1964, which provided, among other things, for the appointment of Edward Feldman as suc-

---

1. The three introductory clauses of the agreement read as follows:

"WHEREAS Haupt appears to be currently unable to meet its commitments and therefore unable to continue its business;

"WHEREAS the Exchange is interested in assisting in the orderly liquidation of the business of Haupt without the delay and expense which may be incident to administrative or other legal proceedings;

"WHEREAS the Banks as creditors of Haupt are desirous of cooperating in the effort to achieve such an orderly liquidation; and"

cessor Liquidator, thereby permitting Mr. Mahony and his assistants to return to their duties at the Exchange. The minutes of the Committee meeting of March 11, 1964, make it clear that the purpose of the steps taken in March 1964 was to permit "the continued liquidation of Haupt in an orderly fashion." The general partners were told, in the course of their discussion prior to signing it, that if they did not sign the agreement, Haupt would go into bankruptcy and the creditors would have their own trustee appointed anyway.

The limited partners took no part in these transactions. In February 1964, certain of them, three of whom are the respondents here, commenced an action in the Supreme Court, New York County, for the appointment of a Receiver of Haupt's assets and affairs. This application was denied on March 18, the Court granting instead a motion by petitioners here to compel arbitration under the Constitution and Rules and Regulations of the Exchange.

On March 23, 1964, an involuntary petition in bankruptcy was filed in this Court against Haupt by three of the limited partners who acted as petitioning creditors and who are among the respondents here. This was countered on March 30, 1964 by a petition of the general partners under Chapter XI for an arrangement which was tantamount to an implementation of the original agreement. Two of the general partners, Messrs. Kamerman and Kaufman, did not join in the petition.

From the facts just stated, several conclusions are inescapable. Haupt was hopelessly insolvent when it was suspended by the Exchange on November 20, 1963 and it has not engaged in the business for which it was organized since that time. No one has suggested in the course of these proceedings that its business can be rehabilitated. On the contrary, its affairs have been the subject of systematic liquidation, a course

of action for which the Committee created by the agreement of November 25, 1963, and not the partnership, has been responsible. Similarly, the institution of proceedings under Chapter XI of the Bankruptcy Act was the act of the Committee and not of the partnership.

Since nearly all the public customers have been paid out,[2] what remains to be done with respect to the Haupt affairs no longer affects the public interest at large, but does affect substantial interests of the banks, the Exchange, the general and the limited partners, and probably others as well. There is ample evidence that these interests are not concordant. As the following discussion is intended to demonstrate, they can be safeguarded only by the normal bankruptcy procedures.

The case came on before Referee Ryan who granted a motion to dismiss the Chapter XI petition and denied a motion for a stay of the pending involuntary bankruptcy proceedings. The record before Referee Ryan is a very extensive one, consisting of several hundred exhibits, many of them lengthy, and a record of testimony running to nearly 1000 pages. I am convinced from a study of this record that the conclusions of the Referee are amply substantiated by the factual record and by valid authority.

It is clear that Ira Haupt & Co. is today an expired partnership and its only future consists in the winding up of its affairs. It has no haven except the Bankruptcy Court.

In the light of this factual background, Referee Ryan was justified in relying upon In re Pure Penn Petroleum Co., 188 F.2d 851, 24 A.L.R.2d 1206 (2d Cir. 1951), as a ground for the dismissal of the Chapter XI petition. This holding made it clear that Chapter XI arrangements "must comprehend something more than a mere surrender by the debtor of all his assets for liquidation and distribution to creditors." (at

---

2. Customers still on the books are those who cannot be located or whose payments have been held up for some legal reason.

p. 855). If all that is in prospect is liquidation, a statutory process for attaining this end is provided by Chapter X of the Bankruptcy Act, and that is the normal and appropriate means for its accomplishment. These are the procedures designed to protect the rights of interested parties. Cf. Esbitt v. Dutch-American Mercantile Corp., 2d Cir., 1964, 335 F.2d 141. A liquidation plan under Chapter XI is not available since "[t]here are good reasons why Congress provided that a sale of all assets may be part of the Chapter X plan but did not so provide with respect to a Chapter XI arrangement * * *." In re Pure Penn Petroleum Co., supra, 188 F.2d at p. 854 et seq. See also Krause, Chapters X and XI—A Study in Contrasts, 19 Bus.Law. 511 (1964).

■ An additional ground relied on by the Referee, and which is substantiated by the record and by valid authority, is that the Chapter XI proceedings were not consented to by all the general partners and were not voluntary. The discussion in the Referee's opinion is sufficient and need not be repeated here. Only two salient facts need to be emphasized—first, that the commencement of the Chapter XI proceedings for an arrangement was not the act of Haupt but the act of the Committee. No one has suggested that Haupt functioned as a partnership after the catastrophic events of November, 1963. Had Haupt not ceased to exist then, it would have come to an end on December 31, 1963, by express terms of the partnership agreement; and the sole managing partner, Mr. Kamerman, who was also liquidator trustee under the partnership agreement, surrendered his rights to the Committee and never functioned as liquidator under the partnership agreement. The acts of all the general partners after

November 20, 1963, were acts of abdication and surrender inconsistent with any notion of continuity of the partnership qua partnership. Under these circumstances, the Chapter XI proceedings were properly dismissed since the persons who initiated them had no power or right to do so; and even if it could be assumed, arguendo, that they retained their partnership status, the consent of all the partners was necessary and it was lacking here. See 8 Collier, Bankruptcy, § 4.02 at pp. 367–9 (14th ed. 1963).

An additional matter worthy of mention is the conclusion of the Referee that the machinery of Chapter XI was reserved by the Committee under the Agreement of November 25, 1963, as "a device to circumvent any attempt on the part of the limited partners to exercise whatever rights they might have under the Bankruptcy Act or otherwise to effect a liquidation of Haupt." The limited partners took no part in the agreements and transactions with the Exchange and the banks. They have initiated a number of lawsuits of a derivative nature and assert in these proceedings that Haupt is entitled to recover substantial sums from the Exchange, the banks and the general partners. Apart from whether these assertions are well founded, only the safeguard of bankruptcy proceedings can preserve the integrity of these claims.

■■ A final matter requiring discussion relates to a ruling affecting the election of the trustee. I find no difficulty in agreeing with the Referee's conclusion that the limited partners were disqualified from voting for the trustee. His decision in this respect was based upon the definition section of the statute § 1(8), 11 U.S.C. § 1(8),[3] entitled,

---

3. Section 1(8) provides as follows:
   "§ 1. *Meaning of words and phrases.* The words and phrases used in this Act and in proceedings pursuant hereto shall, unless the same be inconsistent with the context, be construed as follows:
   *       *       *       *       *

"(8) 'Corporation' shall include all bodies having any of the powers and privileges of private corporations not possessed by individuals or partnerships and shall include partnership associations organized under laws making the capital subscribed alone responsible for the debts

"Meaning of words and phrases \* \* 'corporation'", and which he apparently felt contained language sufficiently broad to warrant the exclusion of such partners from voting under the disenfranchisement provisions of § 44, sub. a, 11 U.S.C. § 72, sub. a,[4] of the Bankruptcy Act. The limited partners contend that this ruling is erroneous because under the provisions of the Bankruptcy Act of 1898, the definitions of corporation specifically included "limited partnerships," whereas the 1938 amendment specifically eliminated "limited partnerships" therefrom. The legislative history, H.R.Rep. No. 1409, 75th Cong., 1st Sess. 5 (1937), makes it clear that Congress made the change, not because of any preoccupation with the disenfranchising provisions, but because it had amended § 5, 11 U.S.C. § 23, so as to expand the application of this section to limited partnerships, a result completely consonant with the previous structure of the statute. This made it no longer necessary to include such partnerships as part of the corporation definitions. There was not, however, any abridgment of the basic principle that the purpose of the disenfranchising provisions is to prevent the election of a trustee who may be too closely related to the bankrupt and thus impair a vigorous independent defense of the creditors' interests. These provisions merely extend and make mandatory "a policy which the Courts had sometimes enforced in the absence of express statutory direction." In re Latham Lithographic Corp., 107 F.2d 749, 750 (2d Cir. 1939). The Referee's conclusion is therefore sustainable on equitable as well as statutory grounds. It follows, therefore, that the disability of the limited partners encompassed all of their claims, whether as general creditors or customer creditors, and that they were properly excluded from voting.

In the opinion of Judge Swan in In re Latham Lithographic Corp., supra, a stockholder-creditor was held to be under a total personal disability, whereas the bona fide assignee of one-half his creditor claim was held qualified to vote under § 44 of the Bankruptcy Act.

It follows from what has been said that the decisions of the Referee are affirmed in all respects.

The petitions to review the orders of the Referee are dismissed.

It is so ordered.

---

of the association, joint-stock companies, unincorporated companies and associations, and any business conducted by a trustee or trustees wherein beneficial interest or ownership is evidenced by certificate or other written instrument; \* \* \*."

4. Section 44, sub. a provides as follows:
"The creditors of a bankrupt, exclusive of the bankrupt's relatives or, where the bankrupt is a corporation, exclusive of its stockholders or members, its officers, and the members of its board of directors or trustees or of other similar controlling bodies, shall, at the first meeting of creditors after the adjudication, or after a vacancy has occurred in the office of trustee, or after an estate has been reopened, appoint a trustee or three trustees of such estate."