Charles A. MEEKER, Appellant,

v.

Carl A. RIZLEY, R. L. Minton, Lee H. Bullard, J. M. Burden, V. P. McClain, C. V. Drennan, Guy S. Hardin, and A. C. LeBlanc, Appellees.

No. 7771.

United States Court of Appeals Tenth Circuit.

June 7, 1965.

See also, 324 F.2d 269.

Dale B. Dilts, Albuquerque, N. M. (Charles A. Meeker, Albuquerque, N. M., prepared the brief) for appellant.

Royce & Meacham, Elk City, Okl., for appellees.

Before LEWIS and SETH, Circuit Judges, and DOYLE, District Judge.

DOYLE, District Judge.

The appeal herein seeks reversal of the judgment of the district court dismissing the case at the completion of all of the evidence. Appellant's contention is that the evidence was and is sufficient to create questions of fact requiring jury determination. The court found that the evidence was insufficient and also found that there had been perjury. We are thus required to determine whether in the light of the evidence presented the trial court should have submitted the cause to the jury.

This inartfully drafted complaint contains numerous counts, all of which arise from the arrest of appellant following an attempt by him to take possession of some oil well casing which had been attached pursuant to an order of the district court of Beckham County, Oklahoma.

The gist of the complaint is that a conspiracy existed among the defendant officials of Beckham County and the other defendants, first, to ruin him financially and to extort $1586.50 from him. He further complains that pipe and fittings valued at $5,000.00 were converted or stolen from him; that his civil and constitutional rights were violated; that Sheriff Bullard negligently failed to safeguard his pipe (after the attachment was dissolved), whereby it was stolen or lost; that in furtherance of the conspiracy to ruin him financially and to extort from him the mentioned sum of money, he was arrested illegally and as a result of trick, he was confined, and finally he was forced by threats of bodily harm and at gunpoint to sign the national census and to do so as a criminal in custody.

Plaintiff is a graduate of the United States Naval Academy who retired with the rank of Commander and who is also a law graduate, but he does not ordinarily practice law. He engages in the oil business on behalf of himself and former associates interested in the tax advantages which this activity offers. It should be here noted that his lawyer who appears in this court and who represented him in the district court, was a somewhat nominal representative in that appellant for the most part has represented himself. He prepared the brief in this court and forwarded and filed a document purporting to be his oral argument in the case—a supplement to the argument which was actually made by his lawyer.

The defendant R. L. Minton, is the County Judge of Beckham County, Oklahoma (before whom the criminal case against appellant was filed); V. P. McClain is the County Attorney of Beckham County, Oklahoma (and the prosecutor of the case); J. M. Burden was the Deputy Sheriff of Beckham County (who made the arrest); Lee H. Bullard is the Sheriff; Carl A. Rizley is a lawyer who practices at Sayre, Oklahoma; Guy S. Hardin is a member of the Texas Bar, who practices at Shamrock, Texas; C.

V. Drennan is a resident of Coleman, Texas, and was the plaintiff in the original civil action out of which the attachment issued. A. C. LeBlanc was the trucker who was employed by appellant to haul the pipe from the site of the well and who appellant claims betrayed him. The action against this defendant has been discontinued due to his death.

It is unnecessary to here report the facts in minute detail. It is, however, important that the character of the proof be examined so as to test the contentions of the plaintiff-appellant that there were disputed issues on most of the counts of the complaints; that he was entitled to judgment as a matter of law on his claim against the sheriff for loss of his pipe and fittings, and that he was deprived of his constitutional rights because of the prejudice of the trial judge.

The inception of all this was a suit filed by C. V. Drennan against appellant in the District Court of Beckham County, Oklahoma, No. 13542, on March 31, 1960. A writ of attachment issued and the casing in question was subsequently attached in aid of suit at the site of the well. On April 7, 1960, at about midnight, appellant sought to remove the pipe. His claim was that he did not know of the attachment, but the trial judge here found to the contrary from the undisputed evidence, holding that this fact had been brought to his attention although he had not been personally served. Deputy Sheriff Burden, who had apparently received word of the impending taking of the pipe, was at the scene and arrested appellant in the act of loading the pipe onto trucks. Appellant was incarcerated in the county jail and, later that day, he was charged with theft of attached property, a misdemeanor, and was released on a cash bond in the amount of $1,000.00. The information was filed by the defendant V. P. McClain. This case was later dismissed upon the payment by appellant of the costs and the execution by him of a release of most of the defendants. This release was apparently proposed and carried out by appellant's then lawyer,

Charles M. Wilson, who testified at the trial on behalf of the defendants.

On the same day that appellant was released from jail, that is, April 8, 1960, C. V. Drennan filed another suit against him in the District Court of Beckham County, No. 13545, seeking the sum of $1435.50. This alleged that appellant was indebted for work performed on the Phillips lease. (The other claim was for work allegedly performed on the Sanders lease). A 1960 Ford automobile standing in appellant's name was attached in this connection, and appellant subsequently paid off the amount of this demand. He still maintains that the attached car was not his property, that it belonged to a friend in the Philippines for whom he had purchased it. This claim, which did not enter into the lawsuit here in question but which was presumably offered as an aggravating feature, was not established in any believable manner.

It is to be noted that Drennan dismissed No. 13542 wherein the embattled attachment had issued and filed a case asserting the same claim in Wheeler County, Texas, against the appellant.

The sole testimony on behalf of the appellant in the case at bar was that furnished by him. It consisted of various conversations involving threats and admissions purportedly made by the various defendants either to appellant or to other persons in his hearing. He even testified to both ends of telephone conversations, stating that he placed his ear against the receiver when defendants or others were talking on the phone. Giving maximum effect to these statements, it must be concluded that they fall short of the target in that they do not establish that there was any conspiracy to either ruin him financially or otherwise injure him, or any conspiracy to deprive him of his constitutional rights. But quite apart from whether this testimony is legally sufficient to create an issue of fact, it must also be concluded that the district court was fully justified in concluding that this evidence was so completely lacking in

probative force as to fail to create any genuine dispute of fact for jury determination. At most, it consisted of heated exchanges interspersed with purported acknowledgments that the speaker was acting with malice toward the appellant. Some representative samples of this testimony are set forth below.[1]

1. "By Mr. Dilts:

"Q. Now did you ever see Mr. Drennan and Mr. Speed in Erick, Oklahoma, during 1959? A. Well, it could have been in 1960. I'm not just certain of the date, but I was in a tourist court there one time when Mr. Drennan and Speed was there. There was some fellow by the name of Hammer, I think, too.

"Q. All right, what was the conversation there regarding this matter? A. Of course Mr. Speed was, his partner, was very violent that I was suing Mr. Colvin. He was just very upset, and Colvin, was upset, too.

"Q. Let's not say what they were upset about. Let's say what they said at this meeting about this particular case. "A. Well, he told me that if I didn't drop this Colvin matter that they were going to get me in any way that they could, and I think one of the expressions was that they were going to turn the bloodhounds loose on me, they were going to buy the sharpest pointed toed shoes they could get and commit a kicking match on me, and it was a bunch of, you know, such of that nature. In other words, the main idea was for me to drop this Colvin suit and if I didn't drop it, they were going to really work me over.

\* \* \* \* \*

"Q. We are not interested in the details of this Colvin case only in so far as it relates to this case. What did Mr. Hardin subsequently say about taking this lawsuit for you against Mr. Colvin? A. He said, 'I'm a hunting partner, I'm a social associate of Mr. Colvin. He's my close friend and I represent him in law and I will not take it,' and not only that, he mentioned two doctors and he mentioned some other people that had been really worked over in a similar way that I had been worked over at Sayre, said that he and Rizley would sure get me if I continued this."

\* \* \* \* \*

"Q. What happened then, what did you do after midnight of April 8th? A. Well, Mr. LeBlanc stated that I had to take this new car that had been bought for this lady in the Philippines that's been mentioned—he told me that I had to go over there in this car that was hers. She had just sent me the money to buy it. Told me I had to go in this car because he was going to stay all might over there, in and around there, and he couldn't bring me back fifteen or twenty miles, and I told him that I was scared to death, that all these threats and also the history over there around Sayre in there is very bad so far as getting on out of state people.

"I told him I was deathly afraid to come over there. I didn't want to take his car because I knew there's a law where they can tie you up without putting up bond.

"And he said, 'Oh, forget it, I mean there's no court order. They won't be able to get you. Go on over there.'"

\* \* \* \* \*

"A. The deputy sheriff, Berden, I think is his name. He's a defendant, in the case."

"Q. All right, what did you tell him when he told you that?

"A. Well, I told him that this was my pipe, that we had come out here and checked the location for orders, that I didn't know anything about this claim of legal custody and that it was completely new to me, and I asked to see copies of the order, you know, that showed that it was under attachment, and he refused to do it, made snide remarks that he and Rizley knew how to take care of out of state boys and I'd better do what Rizley says. That was the gist of the thing."

\* \* \* \* \*

"And then after that, we waited about ten minutes or so so that Mr. Wilson could call Mr. Rizley, then I asked him to call Rizley, and again I got down near the phone so I could hear everything, and the deputy said, 'Well, we got your boy.'

"And Mr. Rizley said, 'Yes. Mr. Hardin had told us all about him coming and I know all about it.'

"And I told Mr. Rizley, I says, 'Now I don't know anything about this court order, I think it's wrong and also to shake me down.'

"And he's a rather smooth fellow. He didn't say too much. He say, 'Well, maybe you will learn better next time when dealing with some of us around here,' or something just like that.

"He was kind of smooth, but the gist of it was that he had me and he was mighty proud of it."

\* \* \* \* \*

"Q. All right. Did you register in the national draft there, the national census

The conclusion seems inescapable that this evidence was tailored to the apparent necessities of the occasion and that it was palpably incredible. Nevertheless, the trial court held the motion of defendants in abeyance and required defendants to present their testimony. Defendants offered the testimony of defendants Rizley, Burden, Minton, and McClain. They also offered testimony of L. J. Langley and H. W. Friar (who did the work relating to the capping of the well and the removal of the casing, and who testified that he gave Meeker the attachment papers prior to the removal incident); Durwood Vinyard, who drove one of the trucks on the night of April 7, and who testified that they were instructed by appellant to approach the lease site with lights out. Other witnesses were Blanche Martin, Rizley's secretary, and Charles M. Wilson, who was appellant's attorney at the time in issue. He explained that he was the one who suggested the release as part of an effort to settle the two criminal cases against appellant in Beckham County— the one which has been mentioned and a speeding case. He was seeking a dismissal of the removal of pipe case but was told by the County Attorney that appellant had threatened to sue him, "the judge, the sheriff and everybody." It was then, according to Wilson, that he came forward with the suggestion that he obtain a release, and he further testified that he obtained the signature of appellant on the release following which the removal of pipe case was dismissed.

█ It is fundamental that issues of fact are for the jury and that the right to have such questions decided by a jury is of constitutional status. This does not mean, however, that the trial judge is stripped of power to penetrate the evidence and determine whether the purported fact issue is theoretical rather than actual, or imaginary rather than real. The general rule is set forth, 5 Moore Federal Practice, ¶50.02[1], p. 2314, as follows:

"* * * a verdict will normally be directed where both the facts and the inferences to be drawn therefrom, *as supported by the overwhelming weight of the evidence,* point so strongly in favor of one party or the other that the court feels reasonable men could not possibly come to a contrary conclusion." [Emphasis supplied]

At page 2316, the author continues:

"* * * In ruling on the motion the trial court views the evidence in its strongest light in favor of the party against whom the motion is made. On appeal, likewise, the appellate court must consider the evidence in its strongest light in favor of the party against whom the motion for directed verdict was made and must give him the advantage of every *fair and reasonable intendment* that the evidence can justify." [Emphasis supplied]

█ The cases support the proposition that a directed verdict is proper even though the evidence is in conflict where the overwhelming weight of the evidence favors the moving party. Thus, in McKenna v. Scott, 202 F.2d 23, Tenth Circuit, the Court of Appeals said:

"The well established rule is that the court should direct a verdict where the evidence is without dispute, or is conflicting but of such conclusive character that if a ver-

there? A. Yes, I did. When I got through paying the bond, I went downstairs and around the corner of the building and started up towards where the car was and I was by myself then, and I got about a block away and the sheriff came running after me and says, 'You've got to come back and register as a criminal for the national census.' "I said, 'Well, I'm no criminal and I

certainly have already registered in the national census.' "And he acted like a gun. He said, 'I'll shoot you, I'll beat you up, I'll keep you in jail, I'll throw the key away.' He says, 'We are going to teach you s. o. b. out-of-staters to do what these local attorneys say, and you should have dropped that Colvin matter.' "

dict were returned for one party, whether plaintiff or defendant, the exercise of sound judicial discretion would require that it be set aside. In other words, where the evidence, with all the inferences which may justifiably be drawn from it, does not constitute a sufficient basis for a verdict for plaintiff or defendant, as the case may be, and therefore if a verdict were returned in favor of such party it would have to be set aside, the court should direct a verdict for the opposite party."

To the same effect is Young v. Johnson, 286 F.2d 365 (10th Cir., 1960).

In Commercial Standard Insurance Co. v. Feaster, 259 F.2d 210 (10th Cir., 1958), the Court said:

" * * * the evidence and inferences fairly to be drawn from the evidence must be considered in the light most favorable to the party against whom the motion is directed. And if the evidence and the inferences fairly drawn therefrom—viewed in that manner—are such that reasonable minded persons in the exercise of fair and impartial judgment may reach different conclusions upon the crucial issue of fact, the motion should be denied and the question submitted to the jury. But it is the province and duty of the court to direct a verdict where the evidence is without dispute or is conflicting but of such conclusive nature that if a verdict were returned for the plaintiff or defendant, as the case may be, the exercise of sound judicial discretion would require that it be set aside. Slocum v. New York Life Insurance Company, 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879; Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Pennsylvania Railroad Co. v. Chamberlain, 288 U.S. 333, 343, 53

S.Ct. 391, 77 L.Ed. 819; McKenna v. Scott, 10 Cir., 202 F.2d 23; Franks v. Groendyke Transport, 10 Cir., 229 F.2d 731; Broderick v. Derby, 10 Cir., 236 F.2d 35."

Numerous other cases support the principle enunciated in McKenna and Commercial Standard Insurance Co.[2]

■ It is amply clear then that the trial judge is not required to recognize some theoretical question of fact tendered by a plaintiff and based upon evidence which is deficient in probative force as against almost conclusive evidence to the contrary.

■ In the instant case the evidence wholly fails to establish any conspiracy either to ruin appellant financially or to violate his constitutional rights. Giving full effect to his testimony it would only establish that some of the defendants were angry at him as a result of other litigation while at least one official, according to appellant, was opposed to him because he was an outsider. From other defendants appellant feared bodily harm. Viewing the evidence realistically, it is not possible to conclude that any conspiracy existed. The Sheriff and his deputy cooperated to a considerable extent in aiding appellant to make bond. Moreover, the criminal case was dropped notwithstanding that the evidence against appellant was strong. Furthermore, appellant was not coerced to settle case No. 13542.

■ The evidence wholly fails to establish that the pipe and fittings were stolen or converted by any of the defendants. As for Sheriff Bullard's responsibility for the loss of his pipe: Since case No. 13542 was dismissed April 20, the attachment lapsed on that date. Meeker's own testimony establishes that the pipe was still on location on or about May 1, and that its disappearance was discovered on or about May 3. Thus at

2. A. B. Small Co. v. Lamborn & Co., 267 U.S. 248, 45 S.Ct. 300, 69 L.Ed. 597; Central Surety & Ins. Corp. v. Murphy, 10 Cir., 103 F.2d 117; Farr Co. v. Union Pacific R.R. Co., 10 Cir., 106 F.2d 437; Oklahoma Natural Gas v. McKee, 10 Cir., 121 F.2d 583; Coppinger v. Republic Natural Gas, 10 Cir., 171 F.2d 4.

the time of the pipe's disappearance, it was no longer in the custody of the sheriff.

The evidence fails to establish that appellant's civil and constitutional rights were violated by any of the defendants, or that the involvement of any of the defendants in Meeker's arrest was in any way illegal. Further, the evidence wholly fails to support the contention that Meeker's arrest was in furtherance of the alleged conspiracy to ruin him or to extort moneys from him. Finally, evidence is lacking to establish that Meeker was forced by threats of great bodily harm and at gun point to sign the national census as a criminal in custody. In short, the direction of a verdict in defendants' favor was highly proper. One thing is certain and that is that appellant became involved to a considerable extent with the law in Beckham County. Much of his difficulties were his fault and were not the result of any conspiracy directed toward him.

For reasons already given, the third alleged error also lacks merit, that is, the refusal of the trial court to direct a verdict against the sheriff for the loss of the pipe and fittings.

As for the fourth alleged error, the record reveals neither bias nor prejudice on the part of the trial judge against appellant. It is true that some of the judge's remarks were somewhat intemperate, and the judge might well have chosen to allow appellant to fully air his grievances, even though they were technically unrelated to the matters before the Court. However, there is no evidence of either bias or prejudice, and it must be added that appellant's behavior was such as to try any judge's patience. In sum, appellant was afforded a hearing on his claims, and this hearing was compatible with the requirements of due process. Appellant was not deprived of his property or of any constitutional rights by the trial judge.

Finally, the subject of the second alleged error is the following remark by the trial judge:

"* * * I will enjoin him [Meeker] and restrain him from prosecuting any case any place against these defendants."

We agree that it was error for the trial judge to issue this injunction. The injunction question was not in the case either by express pleading or as a result of consent by appellant. It appears to have been a matter of afterthought on the part of counsel. Nor does it appear that such relief was necessary to protect the court's jurisdiction.

It must be concluded, therefore, that the injunction against appellant should be vacated and the case is remanded to the trial court for this purpose. In all other respects, the judgment is

Affirmed.