**Harvey R. MILLER, as Trustee in Bankruptcy of Ira Haupt & Co., a limited partnership, Bankrupt, Plaintiff-Appellant,**

v.

**NEW YORK PRODUCE EXCHANGE et al., Defendants-Appellees.**

Nos. 235, 236, Dockets 75–5024, 76–5002.

United States Court of Appeals, Second Circuit.

Argued Dec. 17, 1976.

Decided Feb. 14, 1977.

764

Ira M. Millstein, New York City (Weil, Gotshal & Manges, Carl D. Lobell, Joel B. Harris, Lawrence D. Bernfeld, New York City, of counsel), for plaintiff-appellant.

Judith S. Kaye, New York City (Olwine, Connelly, Chase, O'Donnell & Weyher, John Logan O'Donnell, Robert W. Boyd, Jr., Joseph C. Kaplan, New York City, of counsel), for defendants-appellees New York Produce Exchange, Donald V. MacDonald, Sidney Fashena, I. Usiskin & Co.

Brown, Wood, Ivey, Mitchell & Petty, New York City (Henry F. Minnerop, Duncan N. Darrow, New York City, of counsel), for defendants-appellees Harry B. Anderson, Merrill Lynch Pierce, Fenner & Smith, Inc.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Arthur L. Liman, Robert S. Smith, Adele R. Wailand, New York City, of counsel), for defendants-appellees Harold H. Vogel, Continental Grain Co.

Dewey, Ballantine, Busby, Palmer & Wood, New York City (Hugh N. Fryer, Edward E. Blythe, Raymond F. Brown, Francine J. Morris, New York City, of counsel), for defendants-appellees Walter C. Klein, Bunge Corp.

Before MULLIGAN and VAN GRAAFEILAND, Circuit Judges, and POLLACK, District Judge.*

VAN GRAAFEILAND, Circuit Judge:

On April 11, 1966, plaintiff's predecessor as Trustee commenced the above entitled action to recover approximately $12 million which, he alleged, the bankrupt, Ira Haupt & Co., had lost through the fault of the defendants. Nine years later, after extensive pretrial discovery and a massive accumulation of papers, documents, transcripts and records from this and other proceedings, the case went to trial before Judge Carter and a jury. Following a six-week trial, verdicts were directed in favor of several of the named defendants, and the jury thereafter found for those who remained. Review of the exhaustive record and exhausting briefs discloses no error, and the judgments are affirmed.

This litigation is an off-shoot of one of the most notorious financial scandals of our

* Of the Southern District of New York, sitting by designation.

time, in which some 1.6 billion pounds of salad oil mysteriously disappeared from storage tanks and losses in excess of $200 million were sustained by investors and financial institutions. *See American Express Warehousing, Ltd. v. Transamerica Insurance Co.,* 380 F.2d 277 (2d Cir. 1967); *People v. Bunge Corp.,* 25 N.Y.2d 91, 96, 302 N.Y.S.2d 785, 250 N.E.2d 204 (1969); *Procter & Gamble Distributing Co. v. Lawrence American Field Warehousing Corp.,* 22 A.D.2d 420, 425, 255 N.Y.S.2d 788 (1st Dept.), rev'd 16 N.Y.2d 344, 266 N.Y.S.2d 785, 213 N.E.2d 873 (1965).

Among those who suffered most grievously in this debacle was Ira Haupt & Co. which was forced into bankruptcy. *See In re Ira Haupt & Co.,* 234 F.Supp. 167 (S.D. N.Y. 1964), *aff'd,* 343 F.2d 726 (2d Cir.), *cert. denied,* 382 U.S. 890, 86 S.Ct. 182, 15 L.Ed.2d 148 (1965) & 348 F.2d 907 (2d Cir. 1965). As so often happens in situations of this nature, the victim is forced to seek financial solace from other than the fraudulent miscreant; the target in this case being the New York Produce Exchange and a number of its directors.

The miscreant who magically transformed oil into water was Anthony De Angelis, and the corporate vehicle through which he performed this legerdemain was Allied Crude Vegetable Oil Refining Corp. (Allied). Allied did much of its trading on the New York Produce Exchange (the Exchange); and, in the Spring of 1963, Haupt, a member of the Exchange, became Allied's broker. The events which followed upon this unhappy association are set forth in detail in the opinion of Judge Carter on defendants' summary judgment motion, reported at 378 F.Supp. 1076–1109, N.Y., and need not again be recounted at length. Briefly, however, it appears that Allied attempted to hide its vulnerable position by creating a seller's market through rising prices. To accomplish this, it invested heavily in cottonseed oil futures. By November 1963, it was the buyer in approximately 90% of the future oil contracts on the Exchange, and Haupt was the broker on 80% of these contracts. As the price of oil climbed, Haupt's financial position was rosy. Gains and losses on futures contracts were calculated daily by the New York Produce Exchange Clearing Association, and variation margin payments were paid or received by the Association accordingly. Haupt therefore received daily payments of variation margin from the Association which in turn were collected by it from those who had sold short. However, when Allied began its financial collapse on November 14, 1963, the futures market turned about; and Haupt was then required to pay variation margin for the benefit of the short sellers. During the next five days, until the exchange was closed on November 19, Haupt paid the $12 million which its Trustee in bankruptcy seeks to recover in this suit.

Congress has recognized that excessive speculation and manipulation in commodity transactions obstruct and burden interstate commerce and has enacted preventive legislation known as the Commodity Exchange Act. 7 U.S.C. § 1 *et seq.* Under this Act,[1] the Secretary of Agriculture was authorized to designate boards of trade as "contract markets", and the markets, of which the Exchange was one, were required to provide for the prevention of manipulation of prices and the cornering of any commodity by dealers or operators. 7 U.S.C. § 7; *Case & Co. v. The Board of Trade of the City of Chicago,* 523 F.2d 355, 362 (7th Cir. 1975). The Act also made it unlawful for any person to manipulate or attempt to manipulate the price of any commodity or to corner or attempt to corner any commodity. 7 U.S.C. § 13.

Plaintiff's allegation of wrongdoing on the part of the defendants is that they

1. References herein to the Commodity Exchange Act are to the Act as it existed in 1963. Although the basic intent of the Act remains unaltered, there have been a number of amendments, including one which created the Commodity Futures Trading Commission and transferred authority from the Secretary of Agriculture and the Commodity Exchange Authority to the new Commission. See Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93–463, 88 Stat. 1389.

allowed Allied to gain an inordinately dominant long position in the futures market and then failed to immediately close the market on November 14, 1963 when this position was discovered. Defendants contend, on the other hand, that, prior to November 14, they did not know, and had no way of knowing, what Allied was up to but that Haupt, who was the broker on most of Allied's deals, did. Defendants also contend that their actions subsequent to November 14 were intended only to prevent panic and to attempt to maintain an orderly market. The principal matter in dispute between the parties on appeal involves the correctness of the District Court's rulings and charge concerning the respective duties of Haupt and the defendants.

### The Duties of the Exchange

■ Plaintiff based his claim against the defendants upon alleged violations of both the Commodity Exchange Act and the Sherman Act, 15 U.S.C. § 1 *et seq.* It was his contention that the officers of the Exchange acted both negligently and in bad faith and that therefore the activities of the Exchange were in violation of both acts. The District Court found, however, that there was no evidence to support plaintiff's claim of bad faith and dismissed those portions of the complaint which relied upon such proof.

In submitting the case to the jury, the District Judge instructed it that there were two separate time periods which it must consider in evaluating plaintiff's claims— one from the Spring of 1963 to November 14, and the other from November 14 to November 19, the date on which the Exchange was closed. With regard to the first period, he charged that the Exchange had the initial responsibility for maintaining orderly market conditions and that its directors "must act with the utmost objectivity, impartiality, honesty, and good faith, and they must exercise reasonable diligence in observing and making themselves aware of market conditions in order to carry out their regulatory responsibilities." He charged further, that, if Allied was manipulating or distorting the orderly function of the market during this time and if the defendants "knew or should have had reason to believe or suspect that a manipulation was in progress, or that disruptive forces were at work which would lead to a disorderly market", the directors were required to take appropriate remedial action.

With regard to the second period, it was plaintiff's contention, as outlined by the District Judge, that defendants were negligent in waiting until November 19 to close the market instead of doing so on November 14. The Judge charged that a director has broad discretion in making business judgment; that he could be held liable only if his conduct deviated from that of reasonable men in similar positions and circumstances and he failed to reasonably carry out his duties and abused his discretion in regulating the market.

After carefully reviewing the record, we agree with the District Judge that it is entirely devoid of any evidence of bad faith on the part of the defendants. The Exchange was a non-profit corporation whose directors served without compensation, and none of them stood to gain in any way by permitting Allied to corner the oil market. There is no proof that any of them had actual knowledge of Allied's allegedly unlawful activities. The positions of all traders on the Exchange were kept secret from all other traders and from the Exchange itself, and plaintiff's proof was of the "should have suspected" variety based on indicia pointed to twelve years after the event by plaintiff's expert witnesses. The Commodity Exchange Authority of the Department of Agriculture (CEA), which did know the exact position of every trader on the Exchange because this information was required to be filed with it did not detect any of the wrongdoing which plaintiff contends defendants should have known without the benefit of the same information. The evidence as to defendants' alleged negligence may have been sufficient to make a jury question. There was nothing, however, which would have supported a finding of bad faith.

Proof is also completely lacking that defendants had any ulterior motives in failing to immediately close the market on November 14 when they first learned from the CEA of Allied's large position in futures. When Haupt heard on the same day that Allied was having financial difficulties, it made no effort to notify the Exchange. Moreover, it made no request that the Exchange be closed, until Allied filed for bankruptcy on November 19. Instead, Haupt increased its own position in the market by some 2,510 contracts. During the five-day period between November 14 and November 19, the Exchange was exploring the possibility of arranging for other traders to take over some of Allied's future position; and it did this with the blessing of the CEA. This was in keeping with the "broad and flexible powers" granted the Exchange to enable it to insure an orderly market. *Case & Co. v. The Board of Trade of the City of Chicago, supra,* 523 F.2d at 362. Again, none of the defendants could look forward to any personal gain from keeping the market open.

Where the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, reasonable men can reach only one conclusion, it is insufficient for the jury. *See Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir. 1970). "A fraudulent conspiracy may be shown by circumstantial evidence, but the facts and circumstances relied upon must attain the dignity of substantial evidence and not be such as merely to create a suspicion." *Johnson v. J. H. Yost Lumber Co.,* 117 F.2d 53, 61 (8th Cir. 1941). Suspicion, conjecture and speculation are not enough. *Venzie Corp. v. United States Mineral Products Co.,* 382 F.Supp. 939, 950–51 (E.D.Pa. 1974), *aff'd,* 521 F.2d 1309 (3d Cir. 1975); *Business Development Corp. v. United States,* 428 F.2d 451, 453 (4th Cir.), *cert. denied,* 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970); *Independent Iron Works, Inc. v. United States Steel Corp.,* 177 F.Supp. 743, 746 (N.D.Cal. 1959), *aff'd,* 322 F.2d 656 (9th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). The purported fact issue must be actual rather than theoretical, real rather than imaginary. *Meeker v. Rizley,* 346 F.2d 521, 525 (10th Cir. 1965); it requires more than a "scintilla or modicum of conflicting evidence". *A. B. Small Co. v. Lamborn & Co.,* 267 U.S. 248, 254, 45 S.Ct. 300, 303, 69 L.Ed. 597 (1925). There is not a scintilla of evidence in this case that any of the defendants was guilty of bad faith.

Defendant directors, relying on securities fraud cases such as *Lanza v. Drexel & Co.,* 479 F.2d 1277 (2d Cir. 1973), contend that, without a showing of bad faith or scienter, there can be no liability on their part for failure to control manipulation. Although the District Court did make plaintiff's burden of proof much easier by holding defendants to the more rigorous negligence standard, the jury's finding in defendants' favor makes it unnecessary for us to consider defendants' argument that their duties were less onerous than as described by the District Court.

In sum, we find that plaintiff has no cause to complain concerning the standards which the District Court applied in prescribing the duties of the defendants, and we are satisfied that the jury verdict was fully supported by the evidence.

### The Duties of Haupt

Although the proof is clear that Haupt played a dominant and knowing role in whatever market manipulation was established, appellant, as its Trustee in bankruptcy, seeks to disassociate himself from any wrongdoing on Haupt's part. To do this, appellant now attempts to bring his claim within the coverage of § 70(e) of the Bankruptcy Act, 11 U.S.C. § 110(e) as if he were suing on behalf of the bankrupt's creditors to set aside a fraudulent transfer of corporate assets. *Cf. Schneider v. O'Neal,* 243 F.2d 914 (8th Cir. 1957).

However, the variation margin payments upon which plaintiff's claim is based were not made to the defendants herein, but to the Clearing Association, a separate and distinct corporate entity which is not a party defendant. Plaintiff's suit, nominally

and in actuality, is for "damages". This being the case, plaintiff stands in the bankrupt's shoes and is subject to all claims and defenses which might have been asserted against the bankrupt. *Bank of Marin v. England,* 385 U.S. 99, 101, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966); 4A Collier, Bankruptcy § 70.28, at 385.

■ Section 9 of the Commodity Exchange Act, 7 U.S.C. § 13, made it unlawful for any person to "manipulate or attempt to manipulate the price of any commodity . . . for future delivery on or subject to the rules of any board of trade" or to "corner or attempt to corner any such commodity. . . ." This proscription was binding upon Haupt as a member of the Exchange and a registered future commissions merchant. *Volkart Bros., Inc. v. Freeman,* 311 F.2d 52 (5th Cir. 1962); [2] *Great Western Food Distributors, Inc. v. Brannan,* 201 F.2d 476, 484 (7th Cir.), *cert. denied,* 345 U.S. 997, 73 S.Ct. 1140, 97 L.Ed. 1404 (1953). In addition, Haupt, as a member of the Exchange, was bound to abide by its rules which prohibited manipulative activity. Manipulations "exert a vicious influence and produce abnormal and disturbing temporary fluctuations of prices that are not responsive to actual supply and demand and discourage not only . . . justifiable hedging but disturb the normal flow of actual consignments." *Board of Trade of The City of Chicago v. Olsen,* 262 U.S. 1, 39, 43 S.Ct. 470, 478, 67 L.Ed. 839 (1923).

■ The District Court instructed the jury that Haupt owed a duty to act with reasonable care in maintaining the integrity of the market and that, if its own acts or omissions were a proximate cause of its injuries, it could not recover. Measuring this charge by whether it best promotes the objectives of the Commodity Exchange Act

which are to protect commerce and the national public interest therein, 7 U.S.C. § 5; *cf. Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1287–89 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Kuehnert v. Texstar Corp.,* 412 F.2d 700, 704 (5th Cir. 1969); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F.Supp. 112, 132–138 (S.D. N.Y. 1974), *aff'd in part and rev'd in part,* 540 F.2d 27 (2d Cir. 1976), we think it was eminently correct.

■ Appellant contends that wrongdoing on the part of Haupt should not prevent recovery herein, because this would not be in the public interest.[3] We do not agree. Although the regulatory provisions of the Act apply to both traders and exchanges, the ultimate aim and intent of the Act is the elimination of wrongful conduct on the part of the traders. It is they, not the exchanges, who manipulate commodity markets. Moreover, in view of the pattern of secrecy which surrounds the activities of traders, it is they, rather than the unknowing directors of exchanges, who best can determine whether the salutory objectives of the Act are to be achieved. Errant plaintiffs have sometimes been permitted recovery in the public interest in order to discourage greater wrongdoing by the defendant. *Cf. Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). However, where a defendant's only sin is its failure to prevent transgressions by the plaintiff, no benefit flows to the public from rewarding the transgressor. *Cf. SEC v. Packer, Wilbur & Co.,* 498 F.2d 978, 985 (2d Cir. 1974). We are not yet prepared to hold that it is in the public interest that any plaintiff should be permitted recovery "lest the supposed wrongdoer be allowed to escape a reckoning." *Bangor Punta Operations, Inc. v.*

---

**2.** *Volkart* contains an excellent description of the operation of a commodity futures exchange.

**3.** Although it is not dispositive of the issues before us, we note that in *In re Ira Haupt & Co., supra,* 234 F.Supp. at 169, the court said:

Since nearly all the public customers have been paid out, what remains to be done with respect to the Haupt affairs no longer affects the public interest at large. . . . (Footnote omitted).

*Bangor & Aroostook R.R.,* 417 U.S. 703, 717, 94 S.Ct. 2578, 2585, 41 L.Ed.2d 418 (1974).[4]

### Appellant's Remaining Contentions

Appellant makes other assertions of error, only a few of which merit comment.

 The directors of the Exchange were elected by the entire membership and served without pay. Each was employed full time in other occupations, and appellant named their employers as parties-defendant. The District Judge dismissed the complaint as to these corporate employers because he found nothing in the record to establish that, as members of the Board, the individual defendants were acting in any manner on behalf of their employers. We agree. In any event, because the corporate defendants' liability could only be derivative, the jury verdict in favor of their alleged agents makes the issue moot.

 The District Court admitted into evidence an official document of the CEA containing the data which the Authority had in its files concerning cottonseed oil purchases and sales in 1963, which also contained some statements concerning prices and a commodity squeeze which appellant contends were conclusory. We find no error in this admission. It is often difficult to distinguish between what is fact and what is opinion. *See* 4 Weinstein's Evidence § 803(8)[03] at 185 (1976). For example, the existence or non-existence of a squeeze is demonstrated by a factual compilation of figures. In any event, conclusory statements in an official or business report do not render it ipso facto inadmissible. *See, e.g., Smith v. Universal Services, Inc.,* 454 F.2d 154, 158 n.2 (5th Cir. 1972); *McCarty v. United States,* 185 F.2d 520, 522 (5th Cir. 1950); *Moran v. Pittsburgh-Des Moines Steel Co.,* 183 F.2d 467, 472–73 (3d Cir. 1950). The admission of this evidence was within the broad discretion of the District Court. *United States v. Miller,* 500 F.2d 751, 754 (5th Cir. 1974), *rev'd on other grounds,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976); *United States v. Covello,* 410 F.2d 536, 543 (2d Cir.), *cert. denied,* 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969).

 Other evidentiary rulings complained of were also made in the exercise of the District Court's discretion; and, absent any showing of abuse, its determination is controlling on review. *See United States v. Bowe,* 360 F.2d 1, 15 (2d Cir.), *cert. denied,* 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966); *Olsen v. Realty Hotel Corp.,* 210 F.2d 785, 786–87 (2d Cir. 1954).

The judgment appealed from is affirmed.

---

4. Appellant placed great reliance upon *Lank v. New York Stock Exchange,* 405 F.Supp. 1031, 1036–37 (S.D.N.Y. 1975), which held that the receiver of a defunct securities brokerage firm could sue the Exchange under § 6 of the Securities Exchange Act, 15 U.S.C. § 78f, despite the fact that the brokerage firm's own wrongdoing contributed substantially to its losses. On January 20, 1977, subsequent to briefing and argument herein, we reversed *Lank,* stating:

Thus we conclude that it was the intention of Congress to draw a clear line of demarcation between public investors, on the one hand, who may assert claims against a stock exchange for damages arising out of violations of Section 6, and, on the other hand, members of those exchanges, who may not. The Congress did not enact Section 6 for the purpose of affording protection to the very members of the stock exchanges whose conduct was being regulated at the expense of those exchanges. We therefore hold that a securities exchange is not liable to a member organization for failure to force the member to comply with the exchange's rules. *Lank v. The New York Stock Exchange,* 548 F.2d 61, 66 (2d Cir. 1977).

Although we are considering a different statute, we find that the above reasoning may be applied appropriately to the claim being made herein.